# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 25, 2008          Decided May 9, 2008

No. 06-3063

UNITED STATES OF AMERICA,
APPELLEE

v.

BRITTIAN PERRY DAY,
APPELLANT

Consolidated with
06-3076

Appeals from the United States District Court
for the District of Columbia
(No. 04cr00358-01)

*John W. Karr* argued the cause for appellant.  With him on the briefs was *Theodore S. Allison.*

*Sarah T. Chasson*, Assistant U.S. Attorney, argued the cause for appellee.  With her on the briefs were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, Assistant U.S. Attorney.

Before: TATEL and GARLAND, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Appellant Brittian Perry Day was indicted on multiple counts of mail fraud, wire fraud, and theft/embezzlement in violation of federal law, and one count of first degree fraud in violation of the District of Columbia Code. He was charged with stealing more than $1.5 million by defrauding various employee benefit plans and one charity after he was retained by these institutions as an insurance broker. Day claimed that he lacked the requisite *mens rea*, because physical and emotional damage to his body and brain had rendered him unable to form the intent to defraud or deceive, and he proffered expert testimony to support this defense. The District Court, however, declined to admit certain of this expert testimony. *United States v. Day*, Crim. No. 04-0358, slip. op. (D.D.C. Mar. 29, 2005); *United States v. Day*, Crim. No. 04-0358, slip. op. (D.D.C. Feb. 25, 2005). On April 20, 2005, after a jury trial, appellant was found guilty on six counts of mail fraud under 18 U.S.C. § 1341; ten counts of wire fraud under 18 U.S.C. § 1343; five counts of theft or embezzlement from an employee benefit plan under 18 U.S.C. § 664; and one count of fraud in the first degree under D.C. Code §§ 22-3221 and 22-3222. *See United States v. Day*, 433 F. Supp. 2d 54 (D.D.C. 2006). The District Court denied the Government's request to subject appellant to criminal forfeiture for his mail and wire fraud offenses, and refused to order a forfeiture money judgment on the theft/embezzlement offenses. *United States v. Day*, 416 F. Supp. 2d 79 (D.D.C. 2006). Appellant was sentenced to an aggregate term of imprisonment of 108 months, after which the District Court denied his motion for release pending appeal. 433 F. Supp. 2d at 55 (denying Day's motion "because his appeal . . . [did] not raise a substantial question of law or fact likely to result in reversal, a new trial, or a reduced sentence of imprisonment").

Appellant now challenges the District Court's decisions to exclude the expert testimony relating to his mental state; he also contests his sentence on the ground that the District Court incorrectly calculated his base and adjusted offense levels. The Government cross-appeals, claiming that the District Court erred in holding that the Government was not entitled to forfeiture on the mail and wire fraud charges, and also in denying entry of a money judgment on the charges to which the Government was entitled to forfeiture. We reject appellant's appeals, and uphold both the District Court's decisions to exclude the disputed expert testimony and the sentence imposed by the court. However, we reverse the District Court decisions denying the Government's requests for forfeiture and a money judgment.

## BACKGROUND

Over a 10-year period starting in 1994, Brittian Perry Day caused losses of $1.5 million to multiple employee benefit plans ("the Plans") and to a charity called Food and Friends ("F&F"). Appellant was retained by the Plans and by F&F to procure insurance for them and their trustees. The Plans mailed appellant checks, payable to appellant's wholly-owned insurance company (the "A&D Insurance Agency"), to cover the cost of purchasing the policies that he recommended to them. However, instead of actually obtaining insurance policies for the Plans or F&F, appellant deposited the proceeds into an account held in the name of the A&D Insurance Agency and spent the money on himself. When the Plans asked appellant for evidence of their coverage, he faxed them fake coverage declarations. He also sent the Plans fake renewal applications and reminders to the Plans, and contacted the Plans' billing departments to request prompt payment. Appellant also created fake declaration pages by covering over the old policy terms with correction fluid and retyping them with new policy numbers. When the Federal Bureau of Investigation ("FBI") searched appellant's home, where his business was located, it found blank

declaration pages, declaration pages with "wite-out" on them, and notebooks documenting his activities.

In July 2002, after one of the Plans incurred a claim that should have been, but was not, covered by the insurance it had obtained from appellant, it quickly discerned that it had no insurance. The Plan notified the Department of Labor, which began investigating appellant's business conduct.

In December 2003, F&F purchased what it thought was a pre-paid, three-year insurance policy through appellant. By February 2004, F&F had written $300,000 in checks to A&D Insurance Agency, unaware that appellant had obtained only a one-year policy for F&F that cost approximately $100,000. F&F did not learn until August 2004 that appellant was the subject of a criminal investigation.

The evidence at trial also indicated that appellant had taken steps to protect his ill-gained assets. In July 2002, appellant directed his sister to open a bank account under the name of a fictitious company called Northern Cape Insurance Associates, because he was afraid the FBI was going to seize his other accounts. Thereafter, appellant did business through that bank account. Appellant asked another individual to conceal the existence of his ownership of several beach homes in Rehoboth Beach, Delaware by hiding documents revealing his ownership interests in the homes and saying nothing to the FBI about his interests. The Government contended that these actions "helped appellant hide his assets from forfeiture, minimized his civil liability to the Plans, and gave the appearance of impoverishment, which, in his mind, might persuade the Government not to take significant criminal action against him." Br. for Appellee at 6.

Appellant's defense was that "the depression that followed his [business and domestic] partner's death [in 1990], coupled with business reverses . . . and severe physical and emotional

damage to his body and brain associated with the depression, vascular dementia, three strokes, in 1996, 1999 and 2001, left him sufficiently impaired that he lacked the mens rea to form the specific intent to commit the crimes of which he was convicted." Br. for Appellant at 5. To bolster his defense, appellant proffered the testimony of four expert witnesses who he claimed would attest to his inability to form the requisite *mens rea* to commit the crimes as charged. On February 24, 2005, after a three-day *Daubert* hearing, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to determine whether the proffered expert testimony was relevant and reliable enough to be admitted as evidence, the District Court excluded the first three witnesses – Drs. Abbas Alavi, Arthur Horton, and Edgar Garcia-Rill. On March 25, 2005, after a two-day *Daubert* hearing, the District Court excluded the testimony of the final expert witness, Dr. Michael Spodak. However, the trial judge allowed some friends, relatives, and associates of appellant to testify at trial about "their observations of [appellant's] physical, mental and emotional deterioration over the decade following his partner's death and the apparent changes in his capacity to deal with routine business and social activities after his strokes began in 1996." Br. for Appellant at 17. On April 20, 2005, the jury found appellant guilty on all counts.

The Government's superseding indictment filed on August 27, 2004 included forfeiture allegations; the Government originally sought forfeiture of appellant's primary residence in Washington, D.C., his beach home in Rehoboth Beach, Delaware, and his Mercedes-Benz automobile. The Government also sought entry of a money judgment against appellant in the amount of $1.5 million – the total sum of money allegedly constituting or derived from proceeds of appellant's crimes. After the jury rendered its guilty verdict on the substantive charges, appellant waived his right to a jury trial on the Government's forfeiture claims. The Government asked the District Court to enter the money judgment of $1.5 million and

to order the forfeiture of appellant's primary residence as a substitute asset under 21 U.S.C. § 853(p) in satisfaction of the money judgment. Counsel for Mr. Day did not challenge the total amount sought by the Government in forfeiture, arguing instead that there was no basis in criminal forfeiture law for the Government to obtain a personal money judgment against appellant, and that the mail and wire fraud statutes cited in support of the Government's forfeiture claim did not apply to the offenses of which appellant had been convicted.

On February 22, 2006, the District Court ruled in appellant's favor on the forfeiture issues, holding that the mail and wire fraud statutes did not support a criminal forfeiture action against appellant for his crimes, and that although criminal forfeiture was appropriate for the money stemming from the theft/embezzlement charges, the applicable statutes did not allow the District Court to enter a money judgment. 416 F. Supp. 2d at 87, 91. On April 6, 2006, the District Court sentenced appellant to an aggregate term of 108 months' imprisonment. This appeal and cross-appeal followed. Day appeals the District Court's decisions to exclude the disputed expert testimony and the District Court's calculation of his sentence. The Government cross-appeals the District Court's decisions rejecting forfeiture and denying it a money judgment, claiming that criminal forfeiture is available for the mail and wire fraud charges, and also that entry of a money judgment is appropriate when criminal forfeiture is involved.

## ANALYSIS

### I. STANDARDS OF REVIEW

We have made it clear that, under Federal Rule of Evidence 702, "[a] district court has broad discretion regarding the admission or exclusion of expert testimony, and reversal of a decision on these matters is appropriate only when that discretion has been abused." *Joy v. Bell Helicopter Textron,*

*Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993). This standard of review complies with the Supreme Court's admonition that in reviewing challenges to the admissibility or exclusion of expert testimony, appellate courts must afford trial judges great discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997). The Court has also made it clear that, under *Daubert*, trial judges have "broad latitude to determine" the "reliability" of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999). Even when a trial court's decision to exclude expert testimony is based on a party's failure to comply with rules of discovery, the matter still requires "an exercise of discretion by the trial court." *United States v. Johnson*, 970 F.2d 907, 910 (D.C. Cir. 1992).

Our review of the District Court's sentencing decisions is guided by a three-part test. "Purely legal questions are reviewed *de novo*; factual findings are to be affirmed unless 'clearly erroneous'; and we are to give 'due deference' to the district court's application of the guidelines to facts." *United States v. Goodwin*, 317 F.3d 293, 297 (D.C. Cir. 2003) (alteration, other internal quotation marks omitted).

The District Court's constructions of the applicable statutes covering criminal forfeiture – which implicate when criminal forfeiture is an appropriate penalty and whether money judgments are an appropriate means of enforcing criminal forfeiture – are legal conclusions that we review *de novo*. *See United States v. Vampire Nation*, 451 F.3d 189, 198 (3d Cir. 2006); *United States v. Casey*, 444 F.3d 1071, 1073 (9th Cir. 2006).

## II. THE DISTRICT COURT'S EXCLUSION OF EXPERT TESTIMONY

### A. Exclusion of Testimony Under Federal Rule of Evidence 702

On February 25, 2005, the District Court issued an order excluding the testimony of Drs. Horton, Alavi, and Garcia-Rill on the grounds that it was

> unreliable and unhelpful (or irrelevant) under the requirements embodied in Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in [*Daubert*]. . . . [T]he Court also finds that the proffered testimony fails to pass muster under the case law governing the limited circumstances in which *mens rea* testimony is permitted by the courts, as articulated by this Circuit in *United States v. Childress*, 58 F.3d 693 (D.C. Cir. 1995).

*Day*, slip. op. at 1-2 (Feb. 25, 2005).  Because we find that the exclusion was appropriate under the Federal Rules of Evidence ("FRE"), we need not address the District Court's alternative rationale for the exclusion.

The exclusion of Dr. Garcia-Rill's testimony was the primary issue in the District Court.  As the trial judge explained, "Dr. Alavi and Dr. Horton[] did not purport to offer any diagnosis of Mr. Day, but simply reported and explained the results of examinations . . . they had conducted on him.  Their expert testimony thus did not stand alone; rather, Dr. Garcia-Rill incorporated their results into his 'diagnosis' of Mr. Day." *Day*, 433 F. Supp. 2d at 56 n.2.  Put another way, the trial judge described the three experts as "three legs of a stool, and the stool cannot stand unless all three legs are there.  And Dr. Garcia-Rill is the weak leg in the stool."  Hearing Tr. (2/24/05) at 39.  Day does not dispute that if, as the District Court found, Dr. Garcia-Rill's testimony was properly excluded under FRE 702, then it

follows *a fortiori* that the proffered testimony from Dr. Alavi and Dr. Horton was also properly excluded.

FRE 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. In *Daubert*, the Supreme Court explained that, in applying FRE 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. Scientific testimony is reliable if it is based on "'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 590 (footnote omitted). In short, "[p]roposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Id.*

*Daubert* does not require that "judges become scientific experts, much less evaluators of the persuasiveness of an expert's conclusion." *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996). However, in applying FRE 702, trial judges should focus on experts' "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Although *Daubert* lists a number of factors that a court may consider in determining whether to admit or exclude expert testimony, the Supreme Court made it clear that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching

subject is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission." *Id*. at 594-95.

Finally, a district court's admission or exclusion of evidence under FRE 702 is subject only to limited review:

> The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable. Our opinion in *Joiner* makes clear that a court of appeals is to apply an abuse-of-discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." 522 U.S. at 138-139. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises. . . . Thus, [under *Daubert*, an assessment of the reliability of expert testimony] in a particular case is a matter that the law grants the trial judge broad latitude to determine.

*Kumho Tire*, 526 U.S. at 152-53. Given these legal standards, we find that the District Court's decision to exclude Dr. Garcia-Rill's testimony was not an abuse of discretion.

Dr. Garcia-Rill's report concluded that

Mr. Day's clinical Depression, demonstrated brain damage, and decreased blood flow contributed to impaired critical judgment in daily decisions. . . . There is considerable evidence showing that the frontal lobes in man are

responsible for volition, that is, the performance of deliberate actions. . . . These are precisely the parts of the cortex affected by the Major Depression and "hypofrontality" in Mr. Day, in whom volition and conflict decisions are impaired. Volition is the scientific equivalent[] of the legal term "intent." Therefore, I conclude that Mr. Day's voluntary and deliberate actions were substantially impaired by his medical condition, to the extent that to a high probability [he] could not have appreciated the repercussions of his actions or purposely intended to violate the law.

Joint Appendix ("JA") (Vol. 1) at 165 (Garcia-Rill Report). However, the bases underlying Dr. Garcia-Rill's conclusions were tenuous at best. The doctor's report and findings were premised in large part on the idea that appellant suffered from "Major Depression" – a conclusion that was not supported by appellant's medical records nor established by the other two experts. Dr. Garcia-Rill admitted on cross-examination that there was no psychiatric evidence of depression, such as an actual diagnosis from a clinician or evidence that appellant was prescribed antidepressants. As a neuroscientist (as opposed to a psychologist or psychotherapist), Dr. Garcia-Rill was unable himself to diagnose Day as having depression. Hearing Tr. (2/23/05) at 85-97. The trial judge thus found that Dr. Garcia-Rill's testimony was generally unreliable, stating that "[t]here's no predicate that's reliable for his conclusions. They don't exist in what he says he relies on. . . . He made basic mistakes in his report, [mistakes about] the kind of medication that Mr. Day was on, [his] refusal to consider [Day's] past behavior in the outside world, the definition of the kind of depression it was." Hearing Tr. (2/24/05) at 55.

Most important, the District Court found that Dr. Garcia-Rill's testimony failed to illuminate Day's condition prior to any of the experts' examinations of Day in 2004. The indictment

against Day alleged that "[f]rom in or about March, 1994, and continuing through in or about August, 2004, [Day] devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises." JA (Vol. 1) at 52 (Superseding Indictment). The specific crimes of which appellant was convicted involved fraudulent behavior spanning 1999-2004. Even assuming, *arguendo*, that Dr. Garcia-Rill's conclusions were an accurate assessment of Day's mental capabilities in 2004, there was no concrete physical evidence of any specific impairment (or the degree of impairment) Day suffered during the earlier years of his unlawful scheme. The trial judge thus found that Dr. Garcia-Rill "does nothing more than surmise or speculate as to what Mr. Day's condition may have been at any time prior to his November, 2004, exam by Dr. Horton." Hearing Tr. (2/24/05) at 55. The trial judge noted further that "all of the testimony, as Dr. Alavi and Dr. Horton candidly admit, all relate to Day's condition in 2004 and 2005. . . . Dr. Alavi categorically declined to make any assessment of Mr. Day's brain condition at any time before [Dr. Alavi conducted his Positron Emission Tomography] scan." *Id.* at 57. In other words, even if the experts had made a compelling case that Day lacked the ability to form the intent to deceive as of 2004, they were unable to say that Day lacked this ability in 1994, when the scheme first originated, or in 1999, when the earliest fraud specifically alleged in the indictment began.

Given the problems with Dr. Garcia-Rill's conclusions – and the temporal limitations of the expert testimony from Drs. Alavi and Horton, on which Dr. Garcia-Rill's conclusions were based – the District Court concluded that the experts' testimony had to be excluded under FRE 702 and *Daubert*. The trial judge found that the expert testimony would "confuse the trier-of-fact," that it was not "the product of reliable principles and methods," and that the witnesses had not "appl[ied] the principles and methodology reliably to the facts of the case." *Id.*

at 59-60. The trial judge's determination that the proffered expert testimony "really goes beyond anything that would meet the *Daubert* test and be reliable," *id.* at 60, was not an abuse of discretion.

**B. Exclusion of Testimony Under Federal Rule of Criminal Procedure 16**

On March 29, 2005, the District Court issued an order excluding the testimony of Dr. Michael Spodak on the grounds that the defense had failed to comply with Federal Rule of Criminal Procedure 16(b)(1)(C)(ii), and, in the alternative, held that "the proffered evidence fails to comply with the standards for admissibility set forth . . . in . . . *United States v. Childress*, 58 F.3d 693, 730 (D.C. Cir. 1995)." *Day*, slip. op. at 1 (Mar. 29, 2005). The District Court has made clear, however, that "the *primary* ground for exclusion was defendant's failure to comply with Rule 16." *Day*, 433 F. Supp. 2d at 58. Because we find that the District Court did not abuse its discretion in excluding the expert testimony under Rule 16, we need not address the alternative basis for the exclusion.

Rule 16 governs discovery and disclosure in criminal proceedings, and states in relevant part that if "the defendant has given notice under [Federal Rule of Criminal Procedure] 12.2(b) of an intent to present expert testimony on the defendant's mental condition," FED. R. CRIM. P. 16(b)(1)(C)(ii), then the defendant also "must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial." FED. R. CRIM. P. 16(b)(1)(C). This summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.*

After appellant filed his notice under Rule 12.2 on November 17, 2004, the Government repeatedly requested

discovery regarding appellant's mental condition. Nevertheless, it was only at the status conference on January 25, 2005 that the Government learned the names of the three experts that appellant intended to call as witnesses. Hearing Tr. (1/25/05) at 35-37. The Government then filed a motion on January 26, 2005 to compel production of the expert reports submitted by Drs. Horton, Alavi, and Garcia-Rill because the defendant had not made them available. JA (Vol. 1) at 88-93. The Government received Dr. Garcia-Rill's report only approximately 48 hours before the scheduled *Daubert* hearing. *See* Hearing Tr. (3/25/05) at 6-7. After the District Court excluded the testimony of the first three experts, the Government filed a motion on March 7, 2005 to strike appellant's Rule 12.2 Notice and to exclude expert testimony concerning appellant's mental condition, because appellant had not yet identified an expert who could testify at the trial that was scheduled to begin three weeks later. A week later, at a March 14, 2005 hearing on the Government's motion, defense counsel announced that appellant had retained Dr. Spodak to testify instead of Dr. Garcia-Rill. The Government received Dr. Spodak's report on March 17 and moved to strike it because the two-page report was so vague that it did not meet the standards set forth in Rule 16. *See* JA (Vol. 1) at 203-04 (Spodak Report). The District Court proceeded to hold a *Daubert* hearing on March 21 and 24, 2005, to determine whether to admit Dr. Spodak's testimony. It was only during the Government's cross-examination on March 24, 2005 that Dr. Spodak finally offered a diagnosis of appellant's mental condition. Hearing Tr. (3/24/05) at 16-17, 53. The District Court granted the Government's motion to exclude Dr. Spodak's testimony on March 25, 2005, primarily as a sanction for violating Rule 16.

We hold that the District Court did not abuse its discretion when it excluded Dr. Spodak's testimony. There are several compelling reasons that support this conclusion. First, Dr. Spodak's report did not meet the requirements of Rule 16. The

District Court correctly pointed to the Advisory Committee comments to the 1993 Amendments to Rule 16 – amendments that had included the addition of Rule 16(b)(1)(C) – during his discussion of the deficiencies of Dr. Spodak's report. Hearing Tr. (3/25/05) at 11-12. The Advisory Committee stated that under the new amendments, "the requesting party is to be provided with a summary of the bases of the expert's opinion. . . . That should cover not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under [FRE] 703, including opinions of other experts." FED. R. CRIM. P. 16 advisory committee's note (1993 amendments). Although Dr. Spodak's report provided a page-long list of tests he had performed on Day, interviews he had conducted, and other expert reports he had read, the report failed to state what Dr. Spodak had concluded from any individual test result, interview, or expert report. That failure, in combination with the absence of a clinical diagnosis in the report, made it virtually impossible for the Government to engage in meaningful cross-examination at the *Daubert* hearing. "Upon receipt of Dr. Spodak's report, the government knew no more about appellant's alleged mental deficiencies than it did when appellant filed his Rule 12.2 notice four months earlier." Br. for Appellee at 32. Given that the purpose of Rule 16(b)(1)(C) is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination," FED. R. CRIM. P. 16 advisory committee's note (1993 amendments), the District Court did not err when it determined that Dr. Spodak's report violated Rule 16.

Second, it was not an abuse of discretion for the District Court to conclude that the appropriate sanction for the Rule 16 violation was the exclusion of Dr. Spodak's testimony. Trial courts have the discretion to weigh various options in deciding

how to address a party's violation of a discovery rule. "If a sanction is thought necessary [under Rule 16], it is for the court to decide whether to order a continuance, or to prohibit the party from introducing in evidence the material not disclosed, or to make whatever other order it deems just under the circumstances." CHARLES ALAN WRIGHT, 2 FEDERAL PRACTICE & PROCEDURE: CRIMINAL § 260, at 196-201 (3d ed. 2000) (footnotes omitted). The Supreme Court has held that exclusion of evidence and testimony can be a proper sanction, even against a criminal defendant. *Taylor v. Illinois*, 484 U.S. 400, 414-16 (1988). Moreover, we have rejected the suggestion that *Taylor* requires a trial court to conduct "some sort of 'least restrictive alternative' analysis" before excluding evidence as a sanction. *Johnson*, 970 F.2d at 911.

In *Johnson*, we specifically held that, in order to justify the exclusion of evidence as a sanction for failure to comply with a discovery rule, the trial judge need not find that the noncomplying counsel acted in "bad faith." *Id.* We remanded the case in *Johnson* only because the trial court judge had gone out of his way to praise the *good faith* efforts of the noncomplying attorney. Although this court stated that it "could normally affirm on [the *Johnson*] record," the fact that "the [trial] judge's only factual finding (good faith of counsel) [was] slightly counter to the decision to exclude" caused us to remand the case to allow the trial judge to expressly exercise the discretion afforded under *Taylor*. *Id.* at 912.

In this case, unlike the circumstances under review in *Johnson*, the District Court did *not* believe that Day's counsel had acted in good faith. Indeed, when he granted the Government's motion to exclude Dr. Spodak's testimony, the trial judge stated that this case involved "willful conduct on the part of the defense. And judgments were made along the way that were either intended to or had to be understood as having the effect of putting the government in a box that was prejudicial

and unfair and which had an impact [on] the integrity of the adversary process." Hearing Tr. (3/25/05) at 14; *see also Day*, 433 F. Supp. 2d at 57 (stating that the defendant had "failed manifestly to comply" with Rule 16). As noted above, Dr. Spodak's tardy report did not meet the standards of Rule 16 and he offered no diagnosis until less than a week before trial. In these circumstances, the District Court did not abuse its discretion in excluding Dr. Spodak's testimony.

## III. SENTENCING

Appellant claims that the District Court made several errors in calculating his sentence under the United States Sentencing Guidelines ("U.S.S.G."). For the reasons indicated below, we find that none of appellant's claims has any merit.

### A. Base Offense Level

Under U.S.S.G. § 2B1.1(a)(1), appellant's base offense level was 7. However, the District Court increased the offense by 16 levels under U.S.S.G. § 2B1.1(b)(1)(I) after finding that appellant was responsible for losses of more than $1 million. Appellant contends that, because the trial judge's loss determination was substantially more than the total loss alleged in the counts included in the superseding indictment, the base sentencing level was erroneous and violated his Fifth Amendment right to due process. Appellant's claim fails for two reasons.

First, the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), rendered the Sentencing Guidelines advisory, and stated that "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." *Id.* at 233. Appellant's sentence of nine years fell considerably below the statutory maxima for mail and wire fraud (thirty years) and was

well within the District Court's sentencing discretion. 18 U.S.C. §§ 1341 and 1343.

Second, after the trial judge determined the "appropriate offense guideline" under U.S.S.G. § 1B1.2(b), he had discretion to reasonably determine "relevant conduct" as defined in U.S.S.G. § 1B1.3. "Relevant conduct," for the purposes of the base offense that appellant was charged with, includes conduct that is "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). We defer to the District Court's determination of what constitutes "the same course of conduct or common scheme," "[b]ecause the question of whether conduct in a given case constitutes a 'course of conduct' is inherently fact intensive." *United States v. Jackson*, 161 F.3d 24, 28 (D.C. Cir. 1998). Moreover, "relevant conduct" only needs to be established by a preponderance of the evidence for the trial judge to permissibly take said conduct into account in a sentencing determination. *United States v. Dorcely*, 454 F.3d 366, 371-3 (D.C. Cir. 2006). The trial judge's findings were neither clearly erroneous, contrary to law, nor an abuse of discretion. We therefore hold that the trial judge committed no error in determining that appellant had caused a loss greater than $1 million and in increasing appellant's base offense level.

### B. Obstruction of Justice

The Sentencing Guidelines advise that a trial judge may increase a defendant's sentence by two levels if it is determined that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede" the administration of justice with respect to the investigation. U.S.S.G. § 3C1.1. It does not matter that a defendant was not separately charged with obstruction of justice. U.S.S.G. § 1B1.4 states that, "[i]n determining the sentence to impose within the guideline range . . . the court may consider, without limitation, any information concerning the background, character and conduct of the

19

defendant, unless otherwise prohibited by law." Given the testimony by Government witnesses about the lengths to which appellant had gone to hide his income and assets, the District Court's determination that appellant was guilty of the obstruction of justice was not error under the due deference standard.

### C. Abuse of Trust

The Sentencing Guidelines also advise that a trial judge may increase a defendant's sentence by two levels if it is determined that the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3; *see also* U.S.S.G. § 3B1.3 app. n.1. Whether Day abused a position of trust within the meaning of U.S.S.G. § 3B1.3 is a question of law that we review *de novo. United States v. West*, 56 F.3d 216, 219 (D.C. Cir. 1995). We have already determined that appellant operated as a fiduciary of the employee benefit plans he embezzled from, under both the common law and statutory definitions of "fiduciary." *Chao v. Day*, 436 F.3d 234 (D.C. Cir. 2006) (stating in part that "[a]s the plans' agent, Day was bound by a broker's common law fiduciary duty to faithfully deliver the plans' assets to the insurer," *id.* at 237, and noting that "Day was far more than a mere custodian [of the plans' assets]; he was a broker who solicited, accepted, and then pilfered the plans' assets by reneging on his promise to purchase insurance for the plans' members," *id.* at 238). In light of our earlier decision, we uphold the District Court's determination that appellant abused a position of trust and thus warranted the sentencing enhancement contained in U.S.S.G. § 3B1.3.

### D. Number of Victims

The Government sought to have appellant's sentence increased by four levels under U.S.S.G. § 2B1.1(b)(2)(B), because it alleged that there were more than 50 victims of

appellant's embezzlement. However, the District Court only increased appellant's sentence by two levels under U.S.S.G. § 2B1.1(b)(2)(A) (more than 10 victims), because the trial judge counted only the individual plans, not every member of said plans, as "victims." Although fewer than 10 plans were identified in the superseding indictment, the District Court found that, when all of his "relevant conduct" was considered, appellant had in fact stolen from more than 10 plans. *See* Hearing Tr. (4/6/06 PM) at 14-17. The District Court's determination of appellant's "relevant conduct" was not clearly erroneous.

## IV. CRIMINAL FORFEITURE

After the jury found appellant guilty of the substantive charges and appellant waived his right to have a jury determine whether the Government was entitled to the forfeiture sought, the Government decided that, in lieu of seeking specific property from appellant, it would pursue a $1.5 million money judgment. The Government relied only on the first forfeiture allegation in the superseding indictment to support its $1.5 million request. This allegation incorporated the entire mail and wire fraud scheme alleged in Counts 1-16 of the indictment. JA (Vol. 1) at 50-73 (Superseding Indictment); Br. for Appellee at 44-46. Appellant did not challenge the amount of money that the Government sought to recover, though he challenged the Government's ability to claim forfeiture on the mail and wire fraud counts and the Government's request for a money judgment in the amount of the forfeited property. The District Court held that forfeiture was appropriate on the embezzlement charges, but agreed with appellant that criminal forfeiture was unavailable on the mail and wire fraud counts. *Day*, 416 F. Supp. 2d at 85-88.

Determining whether forfeiture is an appropriate sanction for mail and wire fraud involves unraveling a series of tangled statutes. During the time period encompassing appellant's trial

and sentencing, 28 U.S.C. § 2461(c) stated that, "[i]f a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged . . . with such violation but no specific statutory provision is made for criminal forfeiture upon conviction, the Government may include the forfeiture in the indictment . . . and upon conviction, the court shall order the forfeiture of the property in accordance with the procedures set forth in [21 U.S.C. § 853]." 28 U.S.C. § 2461(c) has since been amended so that its application to general mail and wire fraud charges can no longer be disputed. *See* USA PATRIOT Improvement and Authorization Act of 2005, Pub. L. No. 109-177, § 410, 120 Stat. 192 (2006). However, the newly amended statute was not in effect when Day was arrested, tried, and sentenced. The Government argues that this is no impediment to forfeiture, because § 2461(c) "requires the Court to order criminal forfeiture where a civil forfeiture is authorized, and [18 U.S.C. §] 981(a)(1)(C) in turn supplies the necessary authorization in this case." *Day*, 416 F. Supp. 2d at 86.

18 U.S.C. § 981(a)(1)(C) subjects property to civil forfeiture if it is obtained in violation of various listed statutes *or* if it is obtained as a result of "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)." Meanwhile, 18 U.S.C. § 1956(c)(7)(A) defines "specified unlawful activity" as including "any act or activity constituting an offense listed in § 1961(1) of this title." And, finally, 18 U.S.C. § 1961(1)(B) – part of the Racketeer Influenced and Corrupt Organizations ("RICO") statute – defines "racketeering activity" to include any act that is "indictable under any of the following provisions of title 18," including sections 664 (the embezzlement/theft from employee benefit plans statute), 1341 (the mail fraud statute) and 1343 (the wire fraud statute). In short, the Government argues that criminal forfeiture is authorized for general violations of the mail and wire fraud statutes, as well as for embezzlement from employee benefit plans.

The District Court disagreed, noting that 28 U.S.C. § 2461(c) allowed the Government to seek criminal forfeiture *only* when "no specific statutory provision is made for criminal forfeiture upon conviction." The District Court found that there was a specific statutory provision applicable to criminal forfeiture in mail and wire fraud cases: 18 U.S.C. § 982(a)(2)(A) states that "[t]he court, in imposing sentence on a person convicted of a violation of [the mail or wire fraud statutes, §§ 1341 or 1343], affecting a financial institution, shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." According to the District Court, since appellant's mail and wire fraud unquestionably did not affect financial institutions, § 982(a)(2)(A) would not authorize criminal forfeiture in appellant's case; by the same token, according to the District Court, § 982(a)(2)(A)'s specific application to mail and wire fraud also prevented § 2461(c) from being used to secure criminal forfeiture in cases of this sort, involving general mail and wire fraud. As the District Court stated,

> The plain language of 28 U.S.C. § 2461(c) permits the government to seek criminal forfeiture of the property of a convicted person that would be subject to civil forfeiture, provided that "no specific statutory provision is made for criminal forfeiture upon conviction." Here, 18 U.S.C. § 982(a)(2)(A) is just such a specific statutory provision, authorizing criminal forfeiture upon conviction of mail and wire fraud. By its terms, therefore, Section 2461(c) does *not* authorize criminal forfeiture of mail and wire fraud proceeds.

*Day*, 416 F. Supp. 2d at 86.

We disagree with the District Court's reading of the relevant statutes. We find that criminal forfeiture is available for general mail and wire fraud violations, not merely those

affecting financial institutions.  We note that the District Court's decision in *Day* relied heavily on another district court's opinion – *United States v. Croce*, 345 F. Supp. 2d 492 (E.D. Pa. 2004) (*Croce II*) – which was overruled by the Third Circuit in *Vampire Nation*, 451 F.3d 189 (3d Cir. 2006).  We agree with the Third Circuit's interpretation of the relevant statutes:

> To interpret the statute, we begin with its plain language. Ascribing plain meaning to the words of 28 U.S.C. § 2461(c), criminal forfeiture is not permitted unless (1) a substantive provision exists for civil forfeiture of the criminal proceeds at issue; and (2) there is no specific statutory provision that permits criminal forfeiture of such proceeds.  Thus, we read the statute, enacted eight years after Congress last amended 18 U.S.C. § 982(a)(2), as a "bridge" or "gap-filler" between civil and criminal forfeiture, in that it permits criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized.  Accordingly, under our reading, § 2461(c) permits criminal forfeiture for general mail fraud because (1) 18 U.S.C. § 981(a)(1)(C) authorizes civil forfeiture for general mail fraud; and (2) no statutory provision specifically authorizes criminal forfeiture for general mail fraud.

*Vampire Nation*, 451 F.3d at 199 (internal citation, footnote omitted).  *See also United States v. Jennings*, 487 F.3d 564, 584-85 (8th Cir. 2007) (holding that § 2461 allows for criminal forfeiture of the proceeds of general mail fraud).  We find support for this reading of the applicable statutes in the legislative history of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), which added subsection (c) to 28 U.S.C. § 2461.  The House Report that accompanied an earlier version of CAFRA stated that:

Current law limits civil forfeiture to certain enumerated federal crimes, and by doing so excludes a number of federal crimes that frequently generate criminal proceeds. Because [CAFRA] makes civil forfeiture procedures fair, and civil forfeiture generally should be available to combat federal crimes, it makes sense to extend the availability of forfeiture to these other crimes. Rather [than] simply making civil forfeiture available for all federal crimes, some of which do not generate criminal proceeds, the bill would amend sections 981(a)(1) and 982(a)(2) of title 18 to extend . . . forfeiture (both civil and criminal) to the crimes enumerated in the money laundering statute, 18 U.S.C. § 1956(c)(7).

. . . .

[CAFRA] would [also] amend section 2461 of title 28 to give the government the option of pursuing criminal forfeiture as an alternative to current civil forfeiture if civil forfeiture is otherwise authorized.

H.R. REP. NO. 105-358, pt. 1, at 35 (1997). This legislative history clarifies that the civil and criminal forfeiture statutes were intended to be largely coterminous.

Criminal forfeiture is therefore available for general mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, and not only for mail and wire fraud affecting financial institutions under 18 U.S.C. § 982(a)(2)(A). We find the District Court's interpretation of the statutes to be contrary to both their plain language and congressional intent.

## V.  MONEY JUDGMENT

Although the District Court held that the Government was not entitled to criminal forfeiture as a form of relief on the first forfeiture allegation for the general mail and wire fraud charges under 18 U.S.C. §§ 1341 or 1343, it found that the Government

was entitled to forfeiture on the second forfeiture allegation for appellant's theft/embezzlement charges under 18 U.S.C. § 664. Nevertheless, the District Court refused to enter a money judgment against appellant for the amount of the total embezzlement charges (approximately $40,000) because it found that the applicable forfeiture statutes did not authorize the court to enter money judgments. The Government appeals this ruling.

As noted above, 18 U.S.C. § 2461(c) states that, in circumstances where criminal forfeiture is appropriate, "the court shall order the forfeiture of the property in accordance with the procedures set forth in . . . 21 U.S.C. § 853," and 18 U.S.C. § 981(a)(1)(C) requires the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the violations in question. Neither of these statutory provisions specifically authorizes money judgments, which the trial judge believed to be fatal to the Government's argument. The District Court stated that the Government "[i]mplicitly acknowledg[ed] the lack of support for its position in the statutory language" by arguing that "the practice of entering forfeiture money judgments is established in the case law as a unique aspect of *in personam* criminal forfeiture. . . . [T]he Court finds no such authority emanating from the inherent nature of criminal forfeiture." *Day*, 416 F. Supp. 2d at 89. The District Court's decision once again rested on another district court opinion – *United States v. Croce*, 334 F. Supp. 2d 781 (E.D. Pa. 2004) (*Croce I*) – which was also overruled by the Third Circuit in *Vampire Nation*.

We hold that the District Court erred in denying the Government's request for a money judgment. Nothing in the relevant statutes suggests that money judgments are *forbidden.* Rather, "the open-ended nature of an order forfeiting the proceeds of an offense is implicit in both the mandatory nature of forfeiture and in the procedures Congress created for locating

the forfeitable property itself, or for satisfying the forfeiture judgment with substitute assets." Br. for Appellee at 51; *see also* 21 U.S.C. § 853(b)(2) (property subject to criminal forfeiture includes "tangible and intangible personal property, including rights, privileges, interests, claims, and securities"); § 853(m) (authorizing courts to order depositions "to facilitate the identification and location of property declared forfeited"); § 853(p) (stating that "substitute property" is also subject to forfeiture if, "as a result of any act or omission of the defendant," the directly forfeitable property "(A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty."). We find it instructive that 21 U.S.C. § 853 contains no language limiting the amount of money available in a forfeiture proceeding to those assets in the defendant's possession at the time forfeiture is ordered. As the Ninth Circuit recently noted, "[c]riminal forfeiture under § 853, by definition, bears a direct relation to the proceeds of the crime. [It] is concerned not with how much an individual has but with how much he received in connection with the commission of the crime." *Casey*, 444 F.3d at 1077. Additionally, § 853(o) states that "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes."

The First Circuit recently noted:

There are two primary reasons for permitting money judgments as part of criminal forfeiture orders. First, criminal forfeiture is a sanction against the individual defendant rather than a judgment against the property itself. Because the sanction follows the defendant as a part of the penalty, the government need not prove that the defendant actually has the forfeited proceeds in his possession at the

time of conviction. Second, permitting a money judgment, as part of a forfeiture order, prevents a [convicted defendant] from ridding himself of his ill-gotten gains to avoid the forfeiture sanction.

*United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006) (internal quotation marks, citations omitted). Both the Third Circuit and the Ninth Circuit recently have held that money judgments are appropriate where the Government is entitled to criminal forfeiture, even where the amount of the money judgment exceeds the defendant's current assets. *See Vampire Nation*, 451 F. 3d at 201-03; *Casey*, 444 F.3d at 1077. In each case, the court noted the liberal construction required by § 853(o) (*see Vampire Nation*, 451 F.3d at 202 n.12; *Casey*, 444 F.3d at 1073), and rejected the contrary view because it "would permit defendants who unlawfully obtain proceeds to dissipate those proceeds and avoid liability for their ill-gotten gains." *Vampire Nation*, 451 F.3d at 202; *see also Casey*, 444 F.3d at 1074. Furthermore, in the context of criminal forfeiture under the similar RICO forfeiture statute, 18 U.S.C. § 1963(a), the Second, Seventh, and Eleventh Circuits all agree that money judgments are available. *See, e.g.*, *United States v. Robilotto*, 828 F.2d 940, 948-49 (2d Cir. 1987); *United States v. Ginsburg*, 773 F.2d 798, 799-803 (7th Cir. 1985) (en banc); *United States v. Conner*, 752 F.2d 566, 575-78 (11th Cir. 1985). We now join our sister circuits and hold that money judgments are appropriate in the criminal forfeiture context.

## CONCLUSION

For the reasons indicated in the foregoing opinion, the judgments of the District Court are affirmed in part and reversed in part.

*So ordered.*