An appropriate order will issue.

**UNITED STATES of America,
Plaintiff,**

**v.**

**Anjay PATEL, et al., Defendants.**

**Criminal Action No. 5:11cr031.**

United States District Court,
W.D. Virginia,
Harrisonburg Division.

Jan. 11, 2013.

Robert Chase Abendroth, United States Attorney's Office, Charlottesville, VA,

Sharon Burnham, United States Attorney's Office, Roanoke, VA, Grayson A. Hoffman, Louis K. Nagy, Jeb T. Terrien, United States Attorney's Office, Harrisonburg, VA, for Plaintiff.

Ian Michael Comisky, Blank Rome LLP, Philadelphia, PA, Kenneth W. Ravenell, Paula Xinis, Murphy & Falcon PA, Baltimore, MD, Pat Munroe Woodward, Counselor at Law, Annapolis, MD, for Defendant Anjay Ravindrabhai Patel.

Stuart Alexander Sears, Schertler & Onorato LLP, Washington, DC, Jonathan Shapiro, Greenspun Shapiro PC, Fairfax, VA, John Kenneth Zwerling, Zwerling, Moseley & Sears, PC, Alexandria, VA, for Defendant Shilpaben Patel.

## MEMORANDUM OPINION

MICHAEL F. URBANSKI, District Judge.

In this contraband cigarette trafficking and money laundering prosecution, defendant Anjay Patel ("Patel") seeks to modify the protective order to release assets restrained by the government in pretrial forfeiture. In the notice of forfeiture appended to the indictment, the government seeks to forfeit $20.9 million in Patel's assets, representing the purchase price of the contraband cigarettes bought by members of the Patel conspiracy. Patel claims that: (1) there is insufficient probable cause to support restraint at the $20.9 million figure; (2) pretrial restraint of substitute assets is contrary to law; and (3) he needs release of certain of these assets to pay counsel of his choice. The court cannot accept Patel's arguments. First, probable cause supports the $20.9 million sought by the government, as the applicable forfeiture statutes authorize the forfeiture of gross proceeds obtained from contraband cigarette trafficking and money laundering as well as any property involved in the money laundering. Second, although the law in other circuits is to the contrary, Fourth Circuit precedent authorizes pretrial restraint of substitute assets subject to forfeiture. Third, given the fact that counsel for Patel has been paid sufficient funds to defend this case, the Sixth Amendment does not require release of forfeitable assets for counsel fees. As such, Patel's motion (Dkt. # 334) is **DENIED.**

### I.

After a lengthy undercover sting operation conducted by law enforcement in the Western District of Virginia, Anjay Patel, his wife Shilpaben Patel, and others were named in an 180 count indictment charging conspiracy to traffic in contraband cigarettes, conspiracy to commit money laundering, conspiracy to dispose of untaxed cigarettes, conspiracy to traffic in counterfeit state tax stamps, trafficking in contraband cigarettes, trafficking in counterfeit state tax stamps, and various forms of money laundering. The indictment charges that during the course of the conspiracy, defendants purchased from undercover law enforcement officers approximately 925,329 cartons of untaxed cigarettes at a cost of $20,924,498.56.

The notice of forfeiture attached to the indictment provides notice that certain property of defendants is forfeitable under various forfeiture statutes, including 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), 28 U.S.C. § 2461, and 49 U.S.C. § 80303. Paragraph 2 of the notice of forfeiture specifies certain property to be forfeited, including a $20.9 million monetary judgment,[1] various business entities,

---

1. The monetary judgment provision states as follows: *"Monetary Judgment:* Not less than $20,924,498.56 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate was obtained directly or indirectly as a result of said offenses or is traceable to such property."

a $400,000 promissory note, certain bank accounts, several vehicles, and a parcel of real property used as a distribution facility in Anderson, South Carolina. Paragraph 3 of the notice of forfeiture seeks forfeiture of substitute assets pursuant to 21 U.S.C. § 853(p) and encompasses all of the bank accounts, real property, business entities and conveyances identified by the government as being owned by defendants.

On October 26, 2011, the court issued a protective order to prevent defendants and others from alienating, encumbering, or wasting forfeitable property and substitute assets, thereby preserving the status quo.[2] The protective orders restrain all of Patel's property identified by the government, including bank accounts, businesses, vehicles, and real property, and enjoin him from conducting any transactions that would affect the marketability, value, or availability of those assets for forfeiture. As a result, Patel asserts that he is unable to afford counsel of his choice.[3] Patel has requested modification of the protective orders to release sufficient substitute assets to pay his legal fees. The government opposed this request, arguing that all of the assets referenced in the protective orders are properly restrained as forfeitable assets, and, therefore, Patel cannot use the assets to pay his legal fees or for any other purpose.

In connection with his motion to release substitute assets to pay his counsel, Patel urged the court to conduct a hearing pursuant to *United States v. Farmer*, 274 F.3d 800 (4th Cir.2001), to assess whether prob-able cause exists to support the protective orders and determine whether any assets could be released. In an order entered on August 22, 2012, based on the record that existed at that time,[4] the court granted Patel's request for a *Farmer* hearing and took his motion for release of substitute assets under advisement until that hearing could be convened.

Prior to the scheduled date for the *Farmer* hearing, Patel requested release of the applications supporting the protective orders and the grand jury materials directed to the issue of probable cause for the wholesale pretrial restraint of his assets. The government agreed to the release of the applications, but as the applications themselves simply referred back to the indictment, they provided no additional information regarding the probable cause for the pretrial restraint of defendant's assets. The government objected to disclosure of any grand jury materials, and the court ordered their production for an *in camera* review. Following such review, the court issued a memorandum opinion and order on October 4, 2012, releasing certain grand jury materials related to the forfeiture issue. The grand jury materials released consisted of two items: (1) the testimony that the undercover sting operation sold participants in the Patel conspiracy 925,329 cartons of cigarettes for $20,924,498.56; and (2) an explanation provided by the Assistant United States Attorney ("AUSA") to the grand jury concerning the notice of forfeiture that "[y]ou do not need to consider the money judg-

---

**2.** *See* Dkt. # 27. Various amended protective orders have been issued as well. *See* Dkt. # s 221, 222, and 223.

**3.** Counsel for Patel stated at a May 22, 2012 hearing that Patel was in arrears in his obligations under his fee agreement with counsel. Counsel subsequently filed under seal a copy of the fee agreement. *See* Dkt. # 374.

**4.** At a hearing held on August 27, 2012, the court directed counsel for Patel to advise the court, under seal, as to the amount of money they had been paid to date. By letter dated September 4, 2012, Patel's counsel advised that they had been paid a substantial sum of money which the court believes is more than ample to defend this case. *See* Dkt. # 399, filed under seal.

ment or the property listed as substitute assets."[5]

The *Farmer* hearing was held on October 17, 2012.[6] At the hearing, the government called Special Agent Eric Flagg of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Flagg testified that during the nearly two year span of the undercover operation, the ATF regularly sold contraband cigarettes to Patel and his codefendants for resale outside of Virginia. Flagg testified that during the course of the undercover operation, Patel and his codefendants purchased 925,329 cartons of contraband cigarettes at a cost of $20,924,498.56. Flagg inferred from statements made by Patel and his codefendants that some of the money used to purchase contraband cigarettes from the sting operation were proceeds of the sale of cigarettes purchased previously. Flagg estimated that the gross value of all of the Patel assets restrained to date was $14,093,675.89. This sum included the assets listed under paragraphs 2.B., 2.C., 2.D., 2.E. and 2.F. of the notice of forfeiture, the so-called tainted assets, as well as the substitute assets listed under paragraph 3 of the notice of forfeiture. Flagg could not provide an estimate as to the value of the tainted assets alone. The government also called Special Agent Joy Cuffee of the Internal Revenue Service, who testified that based on her investigation and substantial efforts, no additional assets of Patel had been identified.

## II.

The notice of forfeiture identifies the statutory framework applicable to the contraband cigarette and money laundering counts of the indictment. For certain crimes, Congress has expressly authorized criminal forfeiture. *See* 18 U.S.C. § 982. Other enumerated violations of law are subject to the civil forfeiture statute, 18 U.S.C. § 981. Pursuant to 28 U.S.C. § 2461, the government may seek both criminal and civil forfeiture in a criminal case. This case involves violations of law implicating both the civil and criminal forfeiture statutes.

Paragraph 1.A. of the notice of forfeiture concerns the forfeiture of proceeds of both

---

**5.** The AUSA's statement to the grand jury that it need not consider the money judgment or substitute assets is inconsistent with the notice of forfeiture claiming both the $20.9 million monetary judgment and all of Patel's property sought as substitute assets. Although the AUSA told the grand jury that they did not need to consider those issues, evidence was placed before the grand jury concerning the total amount of contraband cigarettes purchased. In addition, at the *Farmer* hearing, the court heard evidence presented by the government as to both the issue of the $20.9 million monetary judgment and forfeiture of Patel's substitute assets. Therefore, despite the incongruity of this statement by the AUSA to the grand jury, as evidence was presented both to the grand jury and at the *Farmer* hearing, the court will assess the sufficiency of that evidence for probable cause purposes.

**6.** Prior to the *Farmer* hearing, the government filed a motion to dismiss, asserting that it had

recently been apprised by counsel for Patel that he had approximately $240,000 in an offshore account in England which he had failed to disclose. *See* Dkt. # 430. Patel responded that while the offshore account was beyond the scope of the court's protective orders, he was not. As such, he could not use the money in the account in England for attorney's fees without violating the protective orders. Patel's counsel took great umbrage with the assertion by the government that this was late breaking news, maintaining that the government has known all along of this account and the government's motion constituted a "knowing and intentionally false attack" on Patel's credibility. *See* Dkt. # 433. After hearing argument on this issue at the *Farmer* hearing, the court found this representation to be less sinister, amounting only to an apparent telephonic misunderstanding between counsel.

contraband cigarette trafficking and money laundering. Paragraph 1.A., invoking the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C), provides the only route by which the government may seek forfeiture of property as a result of contraband cigarette violations. In contrast, there are two avenues open to the government for forfeiture of property as a result of a money laundering violation, civil forfeiture of proceeds under 18 U.S.C. § 981(a)(1)(C), and criminal forfeiture of property involved in or traceable to a money laundering offense under 18 U.S.C. § 982(a)(1).

The "proceeds" flank of the government's forfeiture campaign is grounded in the civil forfeiture statute. This statute, 18 U.S.C. § 981(a)(1)(C), subjects to forfeiture any property "which constitutes or is derived from proceeds traceable to a violation of ... any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)." "A tortuous journey through the federal code reveals that 'specified unlawful activity' includes trafficking in contraband cigarettes." *United States v. Funds From First Regional Bank Account # XXXXX1859*, 639 F.Supp.2d 1203, 1215 (W.D.Wash.2009).[7] Thus, under § 981(a)(1)(C), any property, real or personal, belonging to Patel "which constitutes or is derived from proceeds traceable to a violation" of the money laundering or cigarette trafficking statutes is subject to civil forfeiture.

For civil forfeiture purposes, the term "proceeds" is defined in § 981 in one of two ways. For cases involving "illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). In cases involving "lawful goods or lawful services that are sold or provided in an illegal manner," the term "proceeds" is defined as a net figure. *See* 18 U.S.C. § 981(a)(2)(B).

The government is authorized to pursue property subject to civil forfeiture in a criminal case pursuant to 28 U.S.C. § 2461(c). Section 2461(c) does three things: (1) it authorizes the government to pursue civil forfeiture in a criminal case by including a notice of forfeiture in the indictment; (2) it states that if the defendant is convicted, the court shall order the forfeiture as part of the sentence; and (3) it makes applicable to the criminal forfeiture proceeding the "procedures" of 21 U.S.C. § 853. In this case, the government complied with § 2461(c) by providing notice of the civil forfeiture in the indictment.

The government's second forfeiture avenue is founded upon the criminal forfeiture statute, 18 U.S.C. § 982(a)(1). Paragraph 1.C. of the notice of forfeiture provides for the forfeiture of property "involved in" or "traceable" to a money laundering offense. There is no provision of the criminal forfeiture statute specifically applicable to contraband cigarette trafficking.

 Deciding whether certain property is subject to forfeiture turns on "wheth-

---

**7.** This "tortuous" course takes the following route: 18 U.S.C. § 1956(c)(7) defines "specified unlawful activity" to include "any act or activity constituting an offense listed in section 1961(1) of this title." Section 1961 is the definitional section of the Racketeer Influenced and Corrupt Organizations ("RICO") statute. Section 1961(1) defines "racketeer-ing activity" to include any act which is indictable under 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and 18 U.S.C. §§ 2341–2346 (relating to trafficking in contraband cigarettes).

er the government has established the requisite nexus between the property and the offense."[8] Fed.R.Crim.P. 32.2(b)(1)(A). Because "forfeiture constitutes an aspect of the sentence imposed [on a defendant] and not a substantive element of an offense, ... the [g]overnment must establish this nexus by a preponderance of the evidence," *United States v. Neal*, No. 03–35–A, 2003 WL 24307070, at *2 (E.D.Va. Sept. 29, 2003) (citing *Libretti v. United States*, 516 U.S. 29, 39, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995), and *United States v. Tanner*, 61 F.3d 231, 235 (4th Cir.1995)), and it may rely on circumstantial evidence to meet this burden of proof. *United States v. Herder*, 594 F.3d 352, 364 (4th Cir.2010), *cert. denied*, 560 U.S. 977, 130 S.Ct. 3440, 177 L.Ed.2d 346 (2010).[9] If the government meets its burden of proof and establishes the requisite nexus between the property and the offense, such that the property is subject to forfeiture, then the court "must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the

statutory criteria." Fed.R.Crim.P. 32.2(b)(2)(A). To protect forfeitable property, the United States can request that the court "enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any action to preserve the availability of [forfeitable] property...." 21 U.S.C. § 853(e)(1).

The central issue raised in the pending motion concerns the government's authority to restrain certain assets of Patel referred to as substitute assets. The ability to reach substitute assets stems from the government's wide-ranging forfeiture authority under Chapter 13 of Title 21 of the United States Code concerning Drug Abuse Prevention and Control. *See* 21 U.S.C. § 853. Specifically, the criminal forfeiture statute, 18 U.S.C. § 982, provides that the "forfeiture of property under this section ... shall be governed by the provisions of section 413 ... of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 853)." 18 U.S.C. § 982(b)(1). As regards civil forfeiture sought in connection with a criminal case, 28 U.S.C. § 2461(c) states that "[t]he procedures in section 413

---

**8.** Federal Rule of Criminal Procedure 32.2 contains procedural rules governing criminal forfeiture. Rule 32.2 states that "[t]he court's determination [regarding the requisite nexus between the property and the offense] may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed.R.Crim.P. 32.2(b)(1)(B).

**9.** If the government seeks forfeiture based on the theory that the property constitutes proceeds of the convicted offense, then it must satisfy a "but for" test in order to establish the requisite nexus under Rule 32.2. *United States v. Bailey*, No. 1:11–10, 2012 WL 569744, at *9 (W.D.N.C. Feb. 22, 2012). This "but for" test requires the government to prove that the defendant " 'would not have [the property] but for the criminal offense.' "

*Id.* (quoting *United States v. Nicolo*, 597 F.Supp.2d 342, 346 (W.D.N.Y.2009)), *aff'd*, *United States v. Nicolo*, 421 Fed.Appx. 57, 60 (2d Cir.2011) *cert. denied*, —— U.S. ——, 132 S.Ct. 338, 181 L.Ed.2d 212 (2011). If the government seeks forfeiture based on the theory that the property was used to commit, or facilitate the commission of, the offense, then it must satisfy a "substantial connection" test in order to establish the requisite nexus under Rule 32.2. *United States v. Herder*, 594 F.3d at 364; *Bailey*, 2012 WL 569744, at *9. Under the "substantial connection" test, "the government must establish that there was a substantial connection between the property forfeited and the offense," which can be done by "showing that use of the property made 'the prohibited conduct less difficult or more or less free from obstruction or hindrance.' " *Herder*, 594 F.3d at 364 (quoting *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir.1990)) (internal quotations omitted).

of the Controlled Substances Act (21 U.S.C. § 853) apply to all stages of a criminal forfeiture proceeding."

The fact that the civil forfeiture statute invokes the "procedures" of 21 U.S.C. § 853 and the criminal forfeiture statute invokes § 853's "provisions" is significant in this case because the statutory authorization for forfeiture of substitute assets stems exclusively from 21 U.S.C. § 853(p). That section provides that if any property representing direct proceeds of, or property used to commit or facilitate the commission of, the offense is unavailable for a specified statutory reason, the United States may instead seek the forfeiture of substitute property, defined in 21 U.S.C. § 853(p)(2) as "any other property of the defendant," up to the "value of the property that would otherwise be subject to forfeiture." *United States v. Oregon*, 671 F.3d 484, 487 (4th Cir.2012). Under § 853(p), property subject to forfeiture is unavailable if "as a result of any act or omission of the defendant," the property (1) "cannot be located upon the exercise of due diligence;" (2) "has been transferred or sold to, or deposited with, a third party;" (3) "has been placed beyond the jurisdiction of the court;" (4) "has been substantially diminished in value;" or (5) "has been commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1). Because criminal forfeiture is remedial in nature, § 853 explicitly states that its provisions "shall be liberally construed" in order to effectuate this purpose. 21 U.S.C. § 853(*o*).

## III.

Patel argues that there is no probable cause authorizing forfeiture of the $20,924,498.56 monetary judgment set forth in paragraph 2.A. of the notice of forfeiture under either the contraband cigarette trafficking or money laundering counts of the indictment. Patel's argument has two components.

First, Patel contends that the $20.9 million figure, representing the total amount paid by the conspiracy for the contraband cigarettes, is inappropriately inflated because it fails to take into account the money laundering allegations of the indictment which allege that the proceeds of the specified unlawful activities, here contraband cigarette sales, were used to purchase more cigarettes. In that regard, Patel points to the fact that counts 83 through 155, charging promotional money laundering, mirror counts 5 through 82, charging contraband cigarette trafficking, and expressly allege that the proceeds of the Patel conspiracy's contraband cigarette sales were returned to the government's undercover sting operation to buy more contraband cigarettes. Because the proceeds of the illegal sales were reinvested by the Patel conspirators and used to purchase more contraband cigarettes, Patel argues that the $20.9 million purchase price figure overstates the proceeds obtained from the illegal activity. Patel argues that because the proceeds of the illegal cigarette sales were used to buy more contraband cigarettes, the government's $20.9 million figure represents double counting and must be reduced, at the very least, by the amount of proceeds the conspirators recycled by making additional contraband cigarette purchases, or $13,089,154.[10] Thus, by including the amount of money recycled by the conspirators in new contraband cigarette sales, Patel contends that the $20.9 million money judgment substantially overstates the amount of contraband cigarette proceeds.

Patel's second argument is that the government's $20.9 million figure represents

---

10. Patel reaches that figure based on the amount of money involved in counts 83 through 155 alleging promotional money laundering.

the gross purchase price for the contraband cigarettes purchased rather than a net profit figure he contends is appropriate under § 981(a)(2)(B). Patel argues that the government has taken the easy way out and has not attempted to calculate net proceeds or trace their course. Patel argues that the net profit figure is the correct one to use because cigarettes themselves are not illegal goods, rather they are lawful goods sold in an unlawful manner, *i.e.*, without payment of applicable taxes. By not even attempting to calculate a net figure, Patel argues that the government's $20.9 million figure is speculative.

For its part, the government argues simply that probable cause exists to forfeit the $20.9 million monetary judgment because that is the amount of money Patel and his alleged co-conspirators paid the undercover sting operation for the 925,329 cartons of contraband cigarettes purchased by them during the course of the conspiracy. Because the indictment alleges that "[i]t was part of the conspiracy for the defendants to acquire untaxed cigarettes in ... Virginia and to transport them or have them transported for distribution in South Carolina, Pennsylvania, New York and other locations ...", the government argues that it is reasonable to infer that the conspirators would resell the cigarettes at a substantial profit. As paragraph 23 of the indictment explains, "[t]he procurement of cigarettes from low tax states or untaxed cigarettes for sale in high tax states without paying the cigarette tax in the high tax state is the essence of contraband cigarette trafficking." Because the $20.9 million figure used in the monetary judgment is a wholesale figure representing the Patel conspiracy's cost of goods sold, the government maintains that it is an extraordinarily conservative estimate of the proceeds derived from the Patel conspiracy's resale of contraband cigarettes.

The government disputes Patel's argument that the $13 million in recycled contraband cigarette proceeds should be deducted from the $20.9 million figure for three reasons. First, the government asserts that Patel's argument ignores the fact that each time the conspirators returned cash proceeds to the undercover sting operation, those monies were used to purchase more contraband cigarettes. Thus, there is no double counting as the cash proceeds were converted into more contraband cigarettes, which were then resold generating additional proceeds. In other words, regardless of the source of the money used to purchase the contraband cigarettes, a total of $20.9 million dollars was spent by Patel and his co-conspirators to purchase the 925,460 cartons of contraband cigarettes. Second, to reduce the amount of the monetary judgment by $13 million as Patel argues essentially immunizes, for forfeiture purposes, more than half of the conspiracy's contraband cigarette purchases. Finally, as to Patel's net profit argument, the government disagrees that contraband cigarettes are lawful goods subject to a net profit regimen under § 981(a)(2)(A) as the United States Code categorically brands contraband cigarettes as illegal goods, making it "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342(a).

■ Patel's arguments, while creative and thought provoking, miss the mark. The court finds that the forfeiture of the $20.9 million monetary judgment to be supported by probable cause under § 981. The fact that $13 million of the proceeds of the conspiracy's contraband cigarette sales was used to buy more contraband cigarettes does not change the fact that the amount of contraband cigarettes purchased by the conspiracy totaled $20.9 million. Patel's argument that the $20.9 million figure should be reduced by at least

$13 million to account for the laundered proceeds is fundamentally flawed in that it ignores the fact that both promotional money laundering and contraband cigarette trafficking are charged as crimes in the indictment. The fact that the conspiracy chose to launder proceeds from contraband cigarette sales by buying more cigarettes does not, and cannot, change the volume of contraband cigarettes trafficked in by the conspiracy. The government is correct to suggest that the $13 million reduction advocated by Patel grants the conspiracy, for forfeiture purposes, a free pass for all illegal cigarette purchases made with laundered funds. At its core, Patel's double counting argument ignores the fact that in exchange for the $13 million, the conspiracy obtained more contraband cigarettes which it could later resell, generating additional proceeds. As such, the court finds that the $20.9 million purchase price is an appropriate, and indeed conservative, figure to use to measure the proceeds flowing from the Patel conspiracy's contraband cigarette trafficking activity.[11]

Patel's tracing argument fares no better. First, courts have routinely authorized the government to seek forfeiture of a money judgment. In *United States v. Diallo*, No. 09CR858, 2011 WL 135005, at *1 (S.D.N.Y. Jan. 13, 2011), aff'd, 461 Fed.Appx. 27 (2d Cir.2012), a case involving the forfeiture of the proceeds of contraband cigarette theft, defendant argued that "a money judgment should not issue under § 981(a)(1)(C) because that statute allows forfeiture of proceeds only if they are traceable to his offense, a requirement not met." The district court, and the Second Circuit in turn, rejected this argument, concluding that "courts may enter in *personam* money judgments in criminal cases pursuant to § 2461(c) because of its incorporation of § 853, which implicitly authorizes such judgments." *Id.* (citing *United States v. Capoccia*, 402 Fed.Appx. 639 (2d Cir.2010), cert. denied, ―― U.S. ――, 131 S.Ct. 1840, 179 L.Ed.2d 795 (2011); *United States v. Kalish*, 626 F.3d 165, 168–69 (2d Cir.2010); *United States v. Awad*, 598 F.3d 76, 78–79 (2d Cir.2010).[12] Other circuits have similarly concluded that § 853 permits the im-

---

**11.** Patel cites *United States v. $3,148,884.40 United States Currency (Seized from Accounts of Bital)*, 76 F.Supp.2d 1063 (C.D.Cal.1999) (hereinafter, *"Bital"*), and *United States v. Hawkey*, 148 F.3d 920 (8th Cir.1998), to support his argument that monies paid to the government in a sting operation should be deducted from any amount subject to forfeiture. Each of these cases is distinguishable. *Bital* arose out of an undercover money laundering sting operation aimed at Mexican and South American banks, including Banco Internacional, S.A. ("Bital"). 76 F.Supp.2d at 1065. The government deposited $3.9 million in certain Bital bank accounts, and $3.8 million of these funds were laundered by the issuance of cashier's checks and returned to the undercover agents running the sting operation. *Id.* As the bulk of the laundered funds were returned to the government, the court concluded that it could not seek forfeiture of additional Bital assets. *Id.* at 1068. In *Hawkey*, a county sheriff diverted concert ticket sales for his personal use. The sheriff refund-

ed some of the stolen money, and the court held he should get forfeiture credit for monies he returned to the county. 148 F.3d at 928. In contrast to the refunds in *Bital* and *Hawkey*, the Patel conspirators did not refund or return anything. Rather, all of the monies paid by the Patel conspirators to the undercover sting operation were used to buy more contraband cigarettes, which the indictment charges were resold out of state at a substantial profit. It confounds logic to suggest that the Patel conspiracy should get forfeiture credit for monies paid to the government to purchase additional contraband cigarettes and expand the scope of the illegal trafficking activity.

**12.** The district court in *United States v. Surgent*, No. 04–CR–364, 2009 WL 2525137, at *6 (E.D.N.Y. Aug. 17, 2009), reached the contrary conclusion, reasoning that the reference in the forfeiture statutes to "property" did not authorize the use of a monetary judgment. *See United States v. Poulin*, 690 F.Supp.2d

position of a money judgment on a defendant who has no assets at the time of sentencing. *See United States v. Day*, 524 F.3d 1361, 1377–78 (D.C.Cir.2008); *United States v. Padrón*, 527 F.3d 1156, 1162 (11th Cir.2008); *United States v. Vampire Nation*, 451 F.3d 189, 201–03 (3d Cir.2006); *United States v. Casey*, 444 F.3d 1071, 1077 (9th Cir.2006); *United States v. Hall*, 434 F.3d 42, 59 (1st Cir.2006); *United States v. Baker*, 227 F.3d 955, 970 (7th Cir.2000). Likewise, Federal Rule of Criminal Procedure 32.2(b)(1)(A) references the government's ability to seek a personal money judgment.

Second, while the Fourth Circuit has not addressed this issue, Patel's net profit argument under § 981(a)(2) has been rejected by other courts. In *United States v. Noorani*, 188 Fed.Appx. 833, 838 (11th Cir. 2006), a contraband cigarette trafficking prosecution, the Eleventh Circuit concluded "that the district court did not err in calculating the order of forfeiture based on the wholesale value of the cigarettes because the statute authorized that amount." *See also Regional Bank Account*

*# XXXXX1859*, 639 F.Supp.2d 1203, 1216 (W.D.Wash.2009) ("The explicit language of the CCTA [Contraband Cigarette Trafficking Act] specifies that trafficking in contraband cigarettes is considered unlawful activity. Global's conduct in selling and transporting contraband cigarettes in violation of the CCTA therefore falls into the category of 'cases involving ... unlawful activities' in which gross proceeds are subject to forfeiture as 'proceeds.' (citing 18 U.S.C. § 981(a)(2)(A))); *Diallo*, 2011 WL 135005, at *2 ("Any other conclusion would allow Diallo to enjoy the benefits of his crime of conviction without recompense, providing an incentive for other criminals to 'rid [themselves] of [their] ill-gotten gains to avoid the forfeiture sanction.' " (quoting *Awad*, 598 F.3d at 78–79)).[13] Consistent with the reasoning of *Noorani* and *Regional Bank Account # XXXXX1859*, the court concludes that because the possession and trafficking of contraband cigarettes is inherently illegal, they are illegal goods for the purposes of § 981(a)(2), requiring forfeiture of gross proceeds which is not limited to the net gain or profit realized from the offense.[14]

---

415, 424–426 (E.D.Va.2010) (discussing and distinguishing *Surgent*). The approach taken in *Surgent* has not been adopted by the Second Circuit in subsequent decisions. *See Kalish*, 626 F.3d at 168; *Awad*, 598 F.3d at 79 n. 5.

**13.** In *United States v. Morrison*, 656 F.Supp.2d 338, 349 (E.D.N.Y.2009), the Eastern District of New York indicated in dicta that although the issue was "not free from doubt" it was prepared to conclude that the cost of contraband cigarettes should be deducted from the gross proceeds generated by the illegal cigarette sales. Unlike the *Noorani* and *Regional Bank Account # XXXXX1859* decisions, the court did not address the applicability of the definitions of proceeds found in § 981(a)(2), concluding instead that defendant did not carry his burden of proving its costs. As such, the *Morrison* opinion skirts the issue addressed in *Noorani* and *Regional Bank Account # XXXXX1859*, and here.

**14.** The Supreme Court's plurality decision in *United States v. Santos*, 553 U.S. 507, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008), does not compel a contrary conclusion. As *Santos* recognized, the federal criminal code defines proceeds in different ways, observing that while § 981(a)(2)(A) defines proceeds to mean receipts, under § 981(a)(2)(B) proceeds means profits. *Santos* analyzed the use of the term proceeds in the money laundering statute, 18 U.S.C. § 1956(a)(1), and concluded that the term referred to profits as opposed to receipts. There, unlike here, the term proceeds was not defined in the money laundering statute. Because § 981(a)(2) expressly defines proceeds, the definition crafted by the plurality in *Santos* has no application here. *See Regional Bank Account # XXXXX1859*, 639 F.Supp.2d at 1216; *United States v. Montour*, CR09–0214 MJP, 2010 WL 1417797, at *3 (W.D.Wash. Apr. 6, 2010).

Patel's reliance on *United States v. Hatfield*, No. 06–CR–0550, 2010 WL 1685826 (E.D.N.Y. Apr. 21, 2010), is unavailing. In *Hatfield*, the court was concerned with the appropriate forfeiture amount in the insider trading context. The court concluded that the entire amount involved in Hatfield's stock sales was not subject to forfeiture, rather forfeiture should be limited to the amount of the gain obtained or loss prevented based on the unlawful use of inside information. "Property that Ms. Hatfield would have obtained absent the fraud is not forfeitable." *Id.* at *4. In contrast to this case, none of the $20.9 million in cigarettes purchased from the sting operation were lawfully obtained. As such, *Hatfield* has no application here.

In sum, therefore, the court believes that the amount of the monetary judgment contained in the notice of forfeiture in this case, $20.9 million, representing the purchase price of the cigarettes bought by the Patel conspiracy, is an accurate and necessarily conservative measure of the proceeds of their contraband cigarette trafficking. The indictment charges that the members of the Patel conspiracy took this volume of contraband cigarettes out of state and resold them. It is reasonable to infer from the allegations in the indictment as to the tax structure in other states that sales of these cigarettes would generate at least $20.9 million in proceeds, proceeds which the conspirators would not have had but for the illegal cigarette purchases. As such, probable cause exists to support forfeiture in that amount based on the evidence presented at the *Farmer* hearing and the contraband cigarette trafficking allegations of the indictment pursuant to the civil forfeiture provisions of 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(2)(A) and the mode of recovery specified in 28 U.S.C. § 2461(c).[15]

## IV.

Having determined that probable cause exists for the forfeiture of up to $20.9 million, the court must next consider the thorny issue of the pretrial restraint of substitute assets. Paragraph 2 of the notice of forfeiture identifies a variety of forfeitable property, including property constituting or derived from proceeds of the contraband cigarette trafficking scheme or involved in or traceable to money laundering. At the *Farmer* hearing, Agent Flagg could not provide an estimate of the value of these tainted properties alone. Paragraph 3 of the notice of forfeiture identifies a host of substitute assets which are subject to restraint under the provisions of 21 U.S.C. § 853(p). Agent Flagg testified that the value of all of the assets identified in the notice of forfeiture, including the assets involved in, the so-called tainted assets, listed in paragraph 2 of the notice of forfeiture and the substitute assets listed in paragraph 3 of the notice of forfeiture, was only $14,093,675.89. That sum falls far short of the $20.9 million claimed in the monetary judgment. At the *Farmer* hearing, IRS Special Agent Cuffee testified as to the lengths taken by the government to locate additional assets belonging to Patel. Based on this testimony, the government asserts that because it cannot locate, upon

**15.** The criminal forfeiture statute provides an alternative mechanism for forfeiture of property involved in a money laundering offense. *See* 18 U.S.C. § 982(a)(1) and (b)(1) The indictment alleges that the conspirators used $13 million in laundered contraband cigarette trafficking proceeds to purchase more cigarettes. Thus, separate and apart from the forfeiture provisions applicable to the contraband cigarette trafficking counts of the indictment, the money laundering counts provide probable cause for the forfeiture of the Patel conspirators' assets up to the amount involved in the money laundering offenses, $13 million, as reflected in counts 83–155 of the indictment pursuant to § 982(a)(1).

the exercise of due diligence, assets reaching the level of the $20.9 million monetary judgment, the court is required to order the forfeiture of substitute assets under 21 U.S.C. § 853(p) up to that amount. Because the value of all of the identified Patel property is only $14 million, the government asserts that the court must restrain all of Patel's assets listed on the notice of forfeiture.

The government's insistence that the court is required to restrain pretrial Patel's substitute assets requires the court to consider two additional questions. First, does 21 U.S.C. § 853(p), authorizing the forfeiture of substitute assets, apply to forfeitures arising under both 18 U.S.C. § 981, governing civil forfeiture, and 18 U.S.C. § 982, governing criminal forfeiture? Second, may Patel's substitute assets be restrained pretrial such that he cannot use them to fulfill his obligations under his fee agreement to pay his counsel?

### A.

■ As to the first question, it is clear that the forfeiture of substitute assets under 21 U.S.C. § 853(p) is applicable to criminal forfeiture undertaken pursuant to 18 U.S.C. § 982. Section 982(b)(1) states that "[t]he forfeiture of property under this section ... shall be governed by the provisions" of 21 U.S.C. § 853. Thus, the government may seek the forfeiture of substitute assets up to the amount called for under § 982. As noted earlier, forfeiture under § 982 is authorized for property involved in or traceable to the money laundering counts. As the indictment charges money laundering in the total amount of $13,089,154, there is a substantial connection between this volume of laundered funds and the offense establishing probable cause for forfeiture in that amount under § 982. As this sum is somewhat shy of the total value for Patel's assets testified to by Agent Flagg,

$14,093,675.89, criminal forfeiture under § 982 alone cannot justify restraint of all of Patel's assets. Thus, the court must consider whether civil forfeiture of Patel's substitute assets is authorized here.

The applicability of the substitute asset provision of § 853(p) to forfeitures undertaken pursuant to the civil forfeiture statute, 18 U.S.C. § 981, requires closer examination. 28 U.S.C. § 2461 authorizes the government to seek civil forfeiture in a criminal case, and provides that "[t]he procedures in ... 21 U.S.C. § 853 apply to all stages of a criminal forfeiture proceeding." Thus, while both criminal and civil forfeiture statutes invoke 21 U.S.C. § 853, they do so using different words. While criminal forfeiture invokes the "provisions" of § 853, civil forfeiture invokes the "procedures" of § 853. As § 853(p) is plainly a provision of § 853, there can be no doubt that § 853(p), providing for forfeiture of substitute assets, applies to criminal forfeiture under § 982. But is § 853(p) properly categorized as a "procedure," warranting application to civil forfeiture as well?

■ Three reasons compel the court to answer this question in the affirmative and conclude that forfeiture of substitute assets under § 853(p) applies to a criminal case in which the underlying forfeiture is authorized under the civil forfeiture statute, 18 U.S.C. § 981. First, as noted above, § 853 directs that "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes." 21 U.S.C. § 853(*o*). Second, 28 U.S.C. § 2461 applies equally to criminal cases regardless of whether the underlying forfeiture is authorized criminally or civilly. It states: "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information

pursuant to the Federal Rules of Criminal Procedure." 28 U.S.C. § 2461(c). Thus, § 2461 affords no distinction for forfeitures in criminal cases based on whether the statute authorizing the forfeiture was civil or criminal. Third, both the plain language and the legislative history of the Civil Asset Forfeiture Reform Act ("CAFRA"), which amended both 28 U.S.C. § 2461 and 18 U.S.C. § 981, indicate that Congress intended that civil forfeiture mirror criminal forfeiture in both substance and procedure. As the Third Circuit noted in *Vampire Nation*, § 2461(c) functions "as a 'bridge' or 'gap-filler' between civil and criminal forfeiture, in that it permits criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized." 451 F.3d at 198; *see also Day*, 524 F.3d at 1376–77 (adopting this interpretation of § 2461); *United States v. Edelkind*, 467 F.3d 791, 799 (1st Cir.2006) (likewise concluding that § 2461(c) is a "bridging statute"); *United States v. Black*, 526 F.Supp.2d 870, 878 (N.D.Ill.2007).

Section 2461's "bridging" or "gap-filling" function is further revealed by considering the statute's legislative history. Congress's aim in passing CAFRA was to "protect legitimate constitutional rights of American citizens, while at the same time protecting this tremendous asset to law enforcement of the seizing and forfeiting of assets." 146 CONG. REC. S1753–02 (daily ed. March 27, 2000) (statement of Sen. Sessions). The goal of Congress in passing CAFRA was "to expand[ ] the reach of federal criminal forfeiture ... to crimes that frequently generate criminal proceeds," H.R. REP. No. 105–358, pt. 1, at 27 (1997), so that "that criminal forfeiture [can] be used in lieu of civil forfeiture where feasible [due to] the heightened due process safeguards of the criminal law." *Id.* pt. 1, at 35; *see also Day*, 524 F.3d at

1376. In addition to enhancing the procedural safeguards applicable during a civil forfeiture proceeding, Congress intended to provide a mechanism to "depriv[e] criminals of the proceeds of crime" by "extend[ing] criminal forfeiture authority to any Federal statute in which civil forfeiture authority exists in order to encourage the use of criminal forfeiture." 146 CONG. REC. S1753–02 (daily ed. March 27, 2000) (statement of Sen. Hatch); *see also* H.R. REP. No. 105–358, pt. 1, at 35 ("[CAFRA] would [also] amend section 2461 of title 28 to give the government the option of pursuing criminal forfeiture as an alternative to current civil forfeiture if civil forfeiture is otherwise authorized."). Thus, the intent of Congress when passing CAFRA was two-fold—to expand the criminal forfeiture authority to the civil forfeiture context and to require that appropriate due process procedures were implemented during a civil forfeiture. Such a purpose suggests that there can be no meaningful difference between 18 U.S.C. § 982's invocation of the "provisions" of § 853 and 28 U.S.C. § 2461(c)'s reference to "procedures" of the same. Thus, to limit applicability of § 853(p) in the context of civil forfeiture would subvert the clear legislative intent that "the civil and criminal forfeiture statutes were intended to be largely coterminous." *Day*, 524 F.3d at 1377.

Consistent with this interpretation, the Fourth Circuit has held that "federal law requires a court to substitute assets for the unavailable tainted property," implicitly recognizing that Section 853(p) is incorporated into the civil forfeiture context through Section 2461. *See United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006) (holding that when a plea agreement or consent order does not explicitly prohibit seeking the forfeiture of substitute assets via civil forfeiture under § 981, the statutory scheme controls and requires the forfeiture of substitute assets pursuant to

§§ 2461(c) and 853(p)); *cf. Kalish,* 626 F.3d at 169 (stating there is "no meaningful difference between the propriety of an in *personam* money judgment arising directly under 21 U.S.C. § 853 … and the propriety of an in *personam* money judgment under 21 U.S.C. § 853 by way of 28 U.S.C. § 2461(c)."); *Capoccia,* 402 Fed. Appx. at 641 (holding that since "the reference in § 2461(c) to the "procedures" of § 853 includes the latter statute's implicit authorization of in *personam* money judgments, we see no reason why this reference should not also include the forfeiture of substitute assets.").

■ Accordingly, the court concludes that under both the civil and criminal forfeiture statutes, the government may seek forfeiture of substitute assets pursuant to 21 U.S.C. § 853(p). In this case, the government has demonstrated the existence of probable cause sufficient for the issuance of a protective order restraining up to $20.9 million in proceeds from contraband cigarette trafficking. The government also has demonstrated that it cannot locate, despite the exercise of due diligence, assets of Patel sufficient to reach that figure. As a consequence, the government may seek forfeiture of Patel's substitute assets up to $20.9 million.

**B.**

Nonetheless, Patel challenges the government's ability to restrain his substitute assets pretrial, arguing that he needs certain of these substitute assets to fund his defense. The government's right to the forfeiture of specific property and substitute assets, as well as to the pretrial restraint of this property and these assets, can conflict with a defendant's Sixth Amendment right to counsel. The Sixth Amendment guarantees a criminal defendant's right to the assistance of counsel, and if a defendant does not require appointed counsel, he has the right "to choose who will represent him." *United States v. Gonzalez–Lopez,* 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). However, "the right to counsel of choice 'is circumscribed in several important respects.'" *Id.* (quoting *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). For example, "'the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.'" *Id.* (quoting *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624–25, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989)).

■ In *Caplin & Drysdale,* following the defendant's guilty plea to drug and distribution charges, the district court ordered the forfeiture of specific property as proceeds of the offenses. 491 U.S. at 619–21, 109 S.Ct. 2646. The defendant sought the release of some of the forfeited assets in order to pay his legal fees, and the district court granted his request. *Id.* at 621, 109 S.Ct. 2646. On appeal, the Fourth Circuit Court of Appeals reversed the district court and the United States Supreme Court affirmed this reversal, holding that the forfeiture provisions of § 853 do not violate the Sixth Amendment because nothing in the statute "prevents a defendant from hiring the attorney of his choice, or disqualifies any attorney from serving as a defendant's counsel." *Id.* at 625, 109 S.Ct. 2646. "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Id.* at 626, 109 S.Ct. 2646. The Court noted that "there is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeita-

ble to pay for their defense." *Id.* at 631, 109 S.Ct. 2646. Thus, the Court rejected the defendant's "claim of a Sixth Amendment right of criminal defendants to use assets that are the [g]overnment's—assets adjudged forfeitable, as [the defendant's] were—to pay attorneys' fees, merely because those assets are in [the defendant's] possession." *Id.* at 632, 109 S.Ct. 2646.

In *United States v. Monsanto*, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989), decided on the same day as *Caplin & Drysdale*, the government sought to forfeit specific property—a home, an apartment, and $35,000 in cash—as proceeds of drug-law violations, and the court issued a restraining order to freeze these assets pending trial. *Id.* at 602–04, 109 S.Ct. 2657. The defendant moved to vacate the restraining order to use the frozen assets to retain an attorney, *id.* at 604, 109 S.Ct. 2657, but the Supreme Court held that the criminal forfeiture and pretrial restraining order provisions under § 853 do not contain an exemption "for assets which a defendant wishes to use to retain an attorney." *Id.* at 614, 109 S.Ct. 2657. The Court explained that "[i]n enacting § 853, Congress decided to give force to the old adage that 'crime does not pay.' We find no evidence that Congress intended to modify that nostrum to read, 'crime does not pay, except for attorney's fees.'" *Id.* While the *Monsanto* Court upheld the pretrial restraint of assets based on a "finding of probable cause to believe that the assets are forfeitable," the Court noted that it was not considering "whether the Due Process Clause requires a hearing before a pretrial restraining order can be imposed." *Id.* at 615, 109 S.Ct. 2657.

The Fourth Circuit addressed this due process issue in *United States v. Farmer*, 274 F.3d 800 (4th Cir.2001). In that case, the defendant was indicted on charges of conspiracy to traffic in clothing bearing counterfeit trademarks, conspiracy to engage in unlawful financial transactions, trafficking in counterfeit clothing, and money laundering. *Id.* at 801. The indictment sought to forfeit, as instruments or proceeds of the offenses pursuant to the civil forfeiture statute, specific property that had been seized two years before the indictment during the execution of a search warrant at the defendant's residence and warehouses. *Id.* at 801–02. The defendant filed a motion for a pretrial, adversary hearing "to determine if a portion of the seized funds should be released so that he could pay defense costs," arguing that he had a "Sixth Amendment right to use his legitimate property to hire the attorney of his choice and that he had been deprived of that right without a meaningful opportunity to be heard in violation of the Due Process Clause." *Id.* at 802. The district court denied the defendant's request for a hearing, and the defendant appealed. *Id.* The Fourth Circuit recognized that "[w]hile *Caplin* made absolutely clear that there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds, Farmer still possesses a qualified Sixth Amendment right to use wholly legitimate funds to hire the attorney of his choice." *Id.* at 804. Addressing *Caplin & Drysdale* and *Monsanto*, the Fourth Circuit noted that those cases "expressly left open the issue of whether a defendant has a Fifth Amendment right to a pretrial hearing to determine whether some or all of the seized assets may properly be used to fund his criminal defense." *Id.* at 803. The Fourth Circuit held that because the defendant could make a "threshold showing of need to use wrongly seized assets to pay his attorneys," *id.* at 804, due process requires a hearing, at which the defendant will have the opportunity "to prove by a preponderance of the evidence that the government seized untainted assets without probable cause and that he needs those same assets to hire counsel." *Id.* at 805. The Fourth Circuit

also held that, at the hearing, the government "may present evidence that [the defendant] has other substantial assets with which to hire attorneys and/or evidence of probable cause to believe that the seized assets are tainted and forfeitable." *Id.*

Patel, having had his *Farmer* hearing, argues that the court may not restrain substitute assets prior to a conviction. Patel's argument is foreclosed in the Fourth Circuit by *In re Billman*, 915 F.2d 916 (4th Cir.1990), *cert. denied*, 500 U.S. 952, 111 S.Ct. 2258, 114 L.Ed.2d 711 (1991).[16] *Billman*, a pre-*Farmer* case, involved the forfeiture and pretrial restraint, pursuant to RICO, of substitute assets that defendant Tom Billman had transferred to a third-party. *Id.* at 917. Billman was a fugitive who had been indicted for mail and wire fraud and racketeering surrounding his transfer of some $22 million to Swiss bank accounts which caused the failure of a Maryland savings and loan association. *Id.* at 918. Billman arranged through a London solicitor to wire transfer $499,935 to a co-conspirator, Barbara McKinney. *Id.* The indictment charged that the proceeds of Billman's racketeering were forfeitable under the RICO forfeiture provisions. *Id.* at 917. The district court

entered a temporary restraining order prohibiting McKinney from disposing of the monies acquired through the wire transfer. *Id.* at 919. After a hearing, the district court concluded that the government failed to prove that the monies wired to McKinney were RICO proceeds and, as such, that the funds belonged to her. *Id.* The Fourth Circuit disagreed, concluding that the monies were substitute assets which could be restrained pending trial. "In summary, we hold that the pretrial restraining provisions of § 1963 do not permit a defendant to thwart the operation of forfeiture laws by absconding with RICO proceeds and then transferring this substitute assets to a third person...." *Id.* at 921. McKinney argued that the continued restraint of the wire transferred funds violated her Sixth Amendment right to counsel. The Fourth Circuit rejected her argument, concluding that the restraint of substitute assets pending forfeiture may be imposed pretrial without infringing a defendant's right to counsel. The court reasoned as follows:

> In *Caplin & Drysdale v. United States*, 491 U.S. 617, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989), the Court explained: "The forfeiture statute does not prevent

---

**16.** With the exception of the Fourth Circuit, every circuit court of appeals that has considered this issue has agreed with Patel that substitute assets cannot be restrained pretrial. *See United States v. Parrett*, 530 F.3d 422, 431 (6th Cir.2008) ("we conclude ... that the plain language of 21 U.S.C. § 853 conveys Congress's intent to authorize the restraint of *tainted* assets prior to trial, but *not* the restraint of *substitute* assets." (emphasis in original)); *United States v. Jarvis*, 499 F.3d 1196, 1204 (10th Cir.2007) ("the United States does not have a ripened interest in ... substitute property until (1) after a defendant's conviction and (2) the court determines the [tainted] property is out of the government's reach for a reason enumerated in [the statute]."); *United States v. Field*, 62 F.3d 246, 249 (8th Cir. 1995) (refusing to permit pretrial restraint of substitute assets under § 853(e)(1)); *United*

*States v. Ripinsky*, 20 F.3d 359, 363–64 (9th Cir.1994) (same); *United States v. Gotti*, 155 F.3d 144, 148–50 (2d Cir.1998) (refusing to permit retrial restraint of substitute assets under 18 U.S.C. § 1963); *In re Assets of Martin*, 1 F.3d 1351, 1359 (3d Cir.1993) (same). The Fourth Circuit has noted the disagreement of other circuit courts of appeals. In an unpublished opinion, *United States v. Bromwell*, 222 Fed.Appx. 307, 311 n. 2 (4th Cir.2007), a panel of the Fourth Circuit declined to stray from *Billman*, noting as follows: "*Billman* was the first case in the courts of appeals to address pretrial restraint of substitute property, and we are aware that our position has not been followed by other circuits.... We, of course, must follow *Billman*, which was decided by a distinguished panel that included retired Justice Powell."

a defendant who has nonforfeitable assets from retaining any attorney of his choosing." McKinney's reliance on this statement is misplaced. The funds in issue are not nonforfeitable assets. They are Billman's substitute assets, which § 1963(m) subjects to forfeiture. The government can forfeit a defendant's contraband assets without infringing his Sixth Amendment right to counsel. *See Caplin & Drysdale*, 109 S.Ct. at 2651–56. Moreover, restraint pending forfeiture can be imposed pretrial. *Monsanto*, 109 S.Ct. at 2665–66.

*Id.* at 922.

The Fourth Circuit has followed *Billman* in a number of subsequent decisions. *United States v. Bollin*, 264 F.3d 391 (4th Cir.2001), involved a prosecution arising out of a wide-ranging investment fraud scheme and conspiracy. One defendant, James Gormley, sought release of substitute assets from his individual retirement account ("IRA") to pay appellate counsel. Although Gormley had been convicted, the government had not moved to amend his forfeiture judgment to forfeit substitute assets. As such, the court held the substitute assets in his IRA were subject to the pretrial restraining order issued pursuant to 21 U.S.C. § 853(e). Citing *Monsanto* and *Billman*, the court held:

> The probable cause found by the grand jury satisfies the government's burden

of proving the allegations of the indictment. This court has held that the pretrial restraint provisions of the RICO forfeiture statute, 18 USC § 1963(d), permits the restraint of substitute assets under § 1963(m) pending resolution of the defendant's case. The restraint and substitute assets provisions of § 853 are identical to those in the RICO statute, and we see no reason to construe them differently. Gormley's substitute assets thus were subject to restraint to preserve their availability for forfeiture pending the outcome of this case.

*Id.* at 421–22 (internal citations omitted).

In *United States v. McHan*, 345 F.3d 262 (4th Cir.2003), the Fourth Circuit citing *United States v. Phillips*, 185 F.3d 183, 188 (4th Cir.1999), and *Billman*, applied the relation-back principle to substitute property, concluding that "the substitute property that is subject to forfeiture under § 853(p) must be read to include all property of the defendant at the time of the commission of the acts giving rise to the forfeiture." 345 F.3d at 272. "To conclude otherwise would invite defendants who anticipate conviction for their unlawful drug-trafficking activities to undertake the obvious step of transferring their assets or removing them from the court's reach prior to indictment and conviction, thereby circumventing the important economic impact of forfeiture." *Id.*[17]

---

**17.** Patel argues that *Billman* should be restricted to authorizing pretrial restraint of substitute assets in RICO cases. First, *Billman* itself does not support such an argument as the opinion "noted that the drug and RICO forfeiture statutes should be similarly construed." 915 F.2d at 921 (citing *United States v. Amend*, 791 F.2d 1120, 1127 n. 6 (4th Cir.1986)). Second, Patel's argument that the holding in *Billman* should be limited to RICO cases is unavailing following the pretrial seizure of substitute assets in both *Bollin* and *McHan*, neither of which addressed forfeiture in the RICO context. Courts frequently draw parallels between forfeiture under § 853 and

the RICO forfeiture provisions of 18 U.S.C. § 1963. Indeed, the *McHan* court noted that the criminal forfeiture provisions under § 853 are, "in nearly all respects, identical to the RICO criminal forfeiture statute." 345 F.3d at 267 (internal citations omitted). "The language of 21 U.S.C. § 853 closely tracks that at 18 U.S.C. § 1963, and courts have often relied on one in interpreting the other." *United States v. Najjar*, 57 F.Supp.2d 205, 208 n. 2 (D.Md.1999); *see also United States v. Neal*, No. CRIMA 03–35A, 2003 WL 24307070, at *5 n. 3 (E.D.Va. Sept. 29, 2003); *United*

District courts in the Fourth Circuit have applied *Billman* to authorize the pretrial restraint of substitute assets. In *In re Restraint of Bowman Gaskins Financial Group,* 345 F.Supp.2d 613 (E.D.Va. 2004), the district court addressed a defendant's right to a *Farmer* hearing to contest the pretrial restraint of substitute assets. In that case, the government was conducting an ongoing visa fraud, money laundering, and tax evasion investigation of an individual and his company and sought to restrain funds that the company had paid to the individual's daughters "for the purpose of preserving these funds for future forfeiture." *Bowman Gaskins,* 345 F.Supp.2d at 614. The individual and the company sought to use the funds to "finance their defense in connection with the ongoing grand jury investigation," *id.* at 617, but the court held that there was probable cause to believe that the funds were the proceeds of the individual and company's illegal activities. *Id.* at 621, 624. The court concluded that the funds could also be forfeited, and thus restrained, as substitute assets. *Id.* at 621. Relying in part on *Billman,* the court held that "it is well-settled in the Fourth Circuit that pretrial restraint of substitute assets is appropriate to preserve those assets for forfeiture if a conviction is ultimately entered." *Id.* at 621 n. 18. Rejecting the argument that substitute assets are exempt from pretrial restraint, the court noted the *Monsanto* Court's recognition that the "sole purpose of § 853's restraining order provision is to preserve the status quo, i.e., to assure the availability of the property pending disposition of the criminal case." *Id.* at 626–27 (quoting *Monsanto,* 491 U.S. at 613, 109 S.Ct. 2657). As such, "Congress plainly did not intend to carve out from this set of forfeitable assets a subset of forfeitable property not subject to pretrial or preindictment restraint; rather it intended all forfeitable property be subject to such restraint." *Id.* at 626. Finally, the court noted that this pretrial restraint of forfeitable assets that the individual and the company wanted to use to pay for counsel "does not abridge the Sixth Amendment right to counsel if there is a finding of probable cause to believe the funds will be subject to forfeiture upon conviction." *Id.* at 627 (citing *Monsanto,* 491 U.S. at 615, 109 S.Ct. 2657).

In similar fashion, the court in *United States v. Wingerter,* 369 F.Supp.2d 799 (E.D.Va.2005), concluded that "the government may seek pretrial to restrain not only tainted assets, but substitute property as well." *Id.* at 806. The *Wingerter* court noted that "the Fourth Circuit has reasoned that § 853(e)(1), and the virtually identical forfeiture provision in the RICO context, must be construed broadly in conjunction with [their substitute asset provisions] to preserve the availability of all forfeitable assets pending trial, including substitute assets." *Id.* at 806 (citing *Billman,* 915 F.2d at 920) (internal quotations omitted); *see also United States v. Woods,* 436 F.Supp.2d 753, 755 (E.D.N.C.2006) ("Therefore, pursuant to controlling law, the government gained an interest in all forfeitable property owned by defendants, including any identifiable substitute property, at the moment in time that the crimes alleged in the indictment occurred. Thus, it is no consequence that the substitute property now claimed as subject to forfeiture was acquired by defendants prior to the alleged illegal activity. Nor is it any objection that title to said property was subsequently transferred to persons or entities other than the remaining party defendants."); *United States v. Wu,* 814 F.Supp. 491, 493 (E.D.Va.1993) ("*Billman* stands for the proposition that, pursuant to 18 U.S.C. § 1963, a district court legiti-

*States v. Wu,* 814 F.Supp. 491, 493 (E.D.Va. 1993).

mately may restrain, pending trial, the disposal of substitute assets, that is, assets that would only be secondarily forfeitable upon conviction.")

The *Wingerter* court noted further that "[i]t is well-settled that pretrial restraint of property, when there is probable cause to believe that it will be subject to forfeiture, does not violate a defendant's Sixth Amendment right to counsel, even if the restraint of these funds makes it impossible for him to pay and retain his chosen lawyer." 369 F.Supp.2d at 807; *see also United States v. Ziadeh*, 230 F.Supp.2d 702, 703 (E.D.Va.2002) ("Defendant Joseph Ziadeh's motion ... asks that the defendants be allowed to use property that must be forfeited if the defendants are convicted to finance their defense. Nothing in the Constitution requires this, and Congress has specifically enacted legislation to prohibit it."); *United States v. Swank Corp.*, 797 F.Supp. 497, 500–04 (E.D.Va.1992) ("Assets that have been targeted and restrained as potentially forfeitable cannot be used to pay legal fees. Mr. Swank's real property holdings are potentially forfeitable as substitute assets. Thus, the Restraining Order will not be modified to allow Mr. Swank to sell off his assets.")

One district court in the Fourth Circuit has taken a slightly different tack, holding that while the restraint of substitute assets is authorized pretrial, such restraint is not mandatory where there is no evidence of efforts by the defendant to divert assets. In *United States v. Najjar*, 57 F.Supp.2d 205 (D.Md.1999), the grand jury indictment found that there was probable cause to believe that the defendant's real property ("the Brinkley Road property") was forfeitable pursuant to RICO, most likely as proceeds traceable to the defendant's alleged racketeering activities. *Id.* at 207. The government sought, and the court issued, a pretrial restraining order, and the defendant moved to modify the restraining

order in order to pay his legal and living expenses with restrained assets. *Id.* at 206–07. The defendant met his initial burden by demonstrating need for the restrained assets through an affidavit "stating that all of his assets are currently frozen," and, thereafter, the court held an adversarial hearing. *Id.* The court found that the grand jury was mistaken and that the Brinkley Road property was "untainted" by the defendant's alleged crimes and "only forfeitable as a substitute asset." *Id.* at 208. This distinction between tainted and substitute assets was important to the court. *Id.*

> While the court has no discretion to unfreeze assets forfeitable [as traceable assets], the same is not true of assets forfeitable [as substitute assets]. The Supreme Court [in *Monsanto*] has held that ... § 853[ ]—and by implication [RICO]—requires a district court to restrain or otherwise secure traceable assets. While the Supreme Court made clear that traceable assets must be restrained, it left open the question of whether substitute assets must be similarly restrained.

*Id.* (internal citations omitted). The court also noted that the Fourth Circuit, through *Billman*, has held that RICO "should be construed to *authorize* pretrial restraint" of traceable and substitute assets "that can be forfeited after conviction," meaning that the restraint of substitute assets is not required. *Id.* (emphasis in original). The court then distinguished *Billman* and held that it was inappropriate to restrain the defendant's untainted interest in the Brinkley Road property. *Id.* at 209. "In *Billman*, the [g]overnment sought to restrain the defendant's substitute assets because the defendant there had absconded overseas with the traceable assets." *Id.* Thus, when a defendant "affirmatively acts to evade the reach of the forfeiture laws, the Fourth Circuit concluded that [RICO]

should be read broadly to counter those attempts." *Id.* In contrast, there was no evidence in *Najjar* that the defendant had attempted to evade forfeiture, so the court held it would be "inappropriate to restrain the untainted portion" of the defendant's interest in the Brinkley Road property. *Id.* The court stated that the defendant's "Sixth Amendment right to counsel is simply more important than the [g]overnment's interest in the untainted portion of [the d]efendant's substitute property." *Id.*[18]

Following the reasoning of *Najjar,* Patel argues that where, as here, there has been no showing that he has attempted to evade forfeiture as was the case in *Billman,*[19] and where the pretrial restraint of substitute assets has rendered him unable to pay for his counsel of choice, the court may liberate substitute assets to pay for legal fees in order to protect the defendant's Sixth Amendment right to counsel.

█ The government disagrees, arguing that Patel does not have a right to the pretrial release of restrained assets because all of the assets covered by the protective order are properly forfeitable either directly or as substitute assets, whether or not they are "tainted" by the instant offenses. Accordingly, the government argues that it has the authority to restrain these assets pretrial in order to ensure their availability for post-conviction criminal forfeiture proceedings, and Patel's Sixth Amendment right to counsel does not include constitutional right to use property subject to forfeiture to pay for any counsel of his choice. Even were Patel found to be indigent, the government asserts that he has not demonstrated the absence of probable cause to restrain the substitute assets in the protective order because the total value of all of the assets being restrained is less than the $20.9 million monetary judgment, which means that all of the assets in the protective order are properly subject to forfeiture and pretrial restraint, regardless of whether they are directly forfeitable as "tainted" assets or forfeitable as substitute assets.

Even under the *Najjar* court's reading of *Billman,* however, no release of assets subject to the protective order is appropriate unless Patel establishes that he lacks sufficient funds to pay counsel. Here, Patel cannot make that showing as his counsel has been paid funds which the court believes are more than sufficient to defend

---

**18.** There is a question regarding the viability of the opinion in *Najjar* following the Fourth Circuit's subsequent decision in *United States v. Alamoudi,* 452 F.3d 310 (4th Cir.2006). In *Alamoudi,* the defendant pled guilty to engaging in prohibited financial transactions with Libya and agreed to a consent order of forfeiture. As the government could not locate assets sufficient to satisfy the consent forfeiture order, it sought forfeiture of substitute assets. Alamoudi argued that the government's effort to reach substitute assets breached the plea agreement and consent order of forfeiture because neither document spelled out the government's intention to seek substitute assets. The Fourth Circuit found that as neither the plea agreement nor the consent order waived the government's ability to obtain substitute assets, "the statutory scheme controls." 452 F.3d at 313. Under this scheme, "Section 853(p) is not discretionary; rather, the statute mandates forfeiture of substitute assets 'when the tainted property has been placed beyond the reach of a forfeiture.' ... [W]hen the Government cannot reach the property initially subject to forfeiture, federal law requires a court to substitute assets for the unavailable tainted property.'" *Id.* at 314 (quoting *McHan,* 345 F.3d at 271); *see also United States v. George,* No. 1:09CR431, 2010 WL 1740814, at *3 (E.D.Va. Apr. 26, 2010) ("The forfeiture of substitute assets is not discretionary with the trial court.").

**19.** At the *Farmer* hearing, the government put on evidence that it contended demonstrated efforts by Patel to evade the protective orders. Such evidence, however, was inconclusive.

this case.[20] Certainly, given the amount of fees that have been paid to Patel's lawyers, there can be no credible argument that Patel's Sixth Amendment rights are in danger of being infringed. As such, the court will not release any of the assets subject to the protective orders to pay Patel's counsel or for any other reason.

### V.

Accordingly, Patel's **Amended Motion to Modify the Government's Pretrial Protective Order (Dkt. # 334) must be DENIED.**[21] An appropriate Order will be entered.

The Clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to defendants and all counsel of record.

**20.** At the time the court ordered the *Farmer* hearing, the court was not aware of the magnitude of counsel fees paid to Patel's lawyers, and was only apprised of the amount of fees paid to counsel by sealed letter dated September 4, 2012. *See* Dkt. # 399.

**21.** The government's motion to dismiss the *Farmer* hearing (Dkt. # 430) is **DENIED** as moot.